# CHARLESTON

## McKinley *v.* Lynch.

Submitted March 10, 1905.   Decided May 11, 1905.

1. PARTNERSHIP—*Trust Relation of Partners to Each Other.*
   All the effects of a partnership are held in trust and each partner is a trustee, and also a *cestui que trust,*—a trustee so far as his own duties bind him,—a *cestui que trust,* so far as duties rest on his co-partners.  (p. 57.)

2. PARTNERSHIP—*Duties of Partners in Dealing With Each Other.*
   Wherein a partnership for procuring options on coal and making sale thereof, and the duties were divided between the partners, two of them to work in the field procuring options and other two to negotiate for the sale of the coal, and the partners having charge of the correspondence relating to negotiations for the sale thereof, intending to purchase the interests of one or both of the partners whose duties were to procure options, must make a full, clear and frank disclosure of all correspondence and negotiations concerning such proposed sale, otherwise the purchase of such partner's interest may be avoided by him.  (p. 59.)

3. PARTNERSHIP—*Dealings With Each Other—Trust Relationship.*
   It is the duty of partners towards each other to refrain from all concealment in the transaction of the partnership business.  If a partner be guilty of any such concealment and derive a benefit therefrom, he will be treated in equity as a trustee for the firm and compelled to account to his co-partner.  (p. 58.)

Appeal from Circuit Court, Harrison County.

Bill by George C. McKinley against Peter I. Lynch.  Decree for defendant.  Plaintiff appeals.

*Reversed.*

E. G. SMITH, DAVIS & DAVIS, SPERRY & SPERRY, and EDWARD A. BRANNON, for appellant.

JOHN BASSEL and C. W. LYNCH, for appellee.

MCWHORTER, JUDGE:

In January, 1900, George C. McKinley, James H. Moore and C. D. Elliott entered into a verbal contract of partnership to option and sell a large body of coal in the counties of Lewis, Doddridge and Harrison. Said McKinley and Moore were to get the options and said Elliott to find a purchaser or purchasers of the coal so optioned, and afterwards Peter I. Lynch was taken into the partnership for the purpose of assisting in making a sale, and all negotiations in relation to the sale were committed to the said Lynch and Elliott and placed in their control. On the 1st day of May, 1900, the said four partners entered into an agreement in writing wherein it was agreed that the said Moore and McKinley had secured and were to secure certain options on coal extending from near Jarvisville, in Harrison county, eastward and including Mineral Point, Goodhope and other points towards West Milford, embracing about seven thousand acres of coal or coal lands, some of which options were taken in the name of Moore, some in the name of McKinley, and others in the name of Moore & Co., or McKinley & Co., or otherwise. It was set forth in the agreement that said Moore and McKinley were to bear the expenses incident to the taking of said options and said Lynch and Elliott to bear all the expenses incident to securing buyers therefor, "All other expenses to be borne by the parties hereto, equally," and the surplus remaining after paying for said coal and deducting the expenses, which were to be borne equally as aforesaid, and the first cost of said coal as agreed in said option or the profits of said coal field were to be shared equally by the parties to said agreement and each was to have an equal one-fourth in such surplus or profits whether said coal field should be sold under any option then existing thereon or that might thereafter exist thereon or whether secured by the said Moore and McKinley or said Lynch and Elliott or either or any of them, or thereafter to be so secured. It was further agreed that no one or more of them should thereafter give an option on said coal or coal field without first having obtained the consent by 'phone or otherwise, to the giving of such option and the price and terms thereof to the other parties to said agreement. On the 12th day of Sep-

tember, 1900, the said partners made a contract between themselves and J. C. Menoher & Co , of Pittsburg, whereby for the sum of $750.00, cash, they assigned and set over to said Menoher the one-fifth interest in and to the coal optioned and located and wherein it was agreed to make sale of all such coal at the rate of $22 per acre and the parties to share in the net profits, each, one equal one-fifth part, and that if such sale should not be effected before the expiration of any of such options the said Lynch, Elliott, McKinley and Moore were to diligently endeavor to secure the extension thereof for as long a time as might be had, or, on such of them as such extension might be obtained to such an extent as to command or control the said coal field, the money necessary for that purpose was to be furnished by Menoher & Co.; and attached to said contract a schedule of the options on the various properties. Correspondence by letter and telegraph was carried on between J. C. Menoher and Peter I. Lynch and C. D. Elliott in relation to the sale, Menoher being in Pittsburg and negotiating the sale of said coal. On the 12th day of December, 1900, late in the afternoon or at night of that day, Moore and McKinley, having been summoned in from the coal field to Clarksburg by Peter I. Lynch, by telephone, were in the store of T. J. Lynch & Co., the sons of Peter I. Lynch, when the question came up about the sale by McKinley of his interest in the partnership, when Peter I. Lynch purchased one-half of the interest of McKinley for the sum of $500.00, one hundred paid in cash and the residue on time, with interest.

At the April rules, 1902, George C. McKinley filed his bill in the circuit court of Harrison county against Peter I. Lynch, alleging that the said Lynch had defrauded him in the purchase of the one-half of his said interest by fraudulently withholding and concealing from him information in regard to the sale of said coal, and the correspondence and contract between said Lynch and Elliott and J. C. Menoher and had misrepresented to him the true condition of the negotiations for the sale of the said coal, with intent to deceive and mislead plaintiff and to fraudulently procure from him the contract of sale of his interest, at a price much below its true value, and prayed that defendant be required to answer and to produce and file all the contracts and letters

and correspondence touching or concerning the consumma-
tion of said sale of coal lands or the negotiations leading
thereto, and that the contract of plaintiff's sale to Lynch on
December 12, 1900, be cancelled, annulled and set aside and
defendant be required to pay plaintiff the equal one-fifth
part of all profits accrued or thereafter to accrue to said
partnership, and offering to return to said Lynch the $500.00
paid by him to plaintiff for such interest.

The defendant, Lynch, filed his answer to said bill denying
all fraud and fraudulent misrepresentations and the with-
holding or concealing of correspondence, or information,
from plaintiff. Upon the filing of said answer the plaintiff
filed an amended supplemental bill exhibiting the corres-
pondence brought out by the answer of the defendant,
especially the telegrams between J. C. Menoher and Peter I.
Lynch, dated December 10, 11 and 12, 1900, and numbered
respectively, 11, 12, 13 and 14.

Some three hundred pages of depositions were taken and
filed in the cause and on the 29th day of January, 1904, the
cause was heard upon the original bill and answer of defend-
ants thereto, and general replication to such answer; on the
amended bill and the answer of the defendant thereto, and
general replication to such answer; on the depositions taken
by both parties and filed in the cause. Upon such hearing
the court being of the opinion that the plaintiff was not enti-
tled to the relief prayed for in his bills, the same were dis-
missed and costs awarded the defendant; from which decree
dismissing his bill the plaintiff appealed.

The partnership consisting of the said McKinley, Elliott,
Lynch, Moore and Menoher & Co., had acquired options
upon some ten thousand acres of coal at $15.00 per acre
and were negotiating sale of the same at the price of
$22.00 per acre, making a profit to the partners of about
$70,000.00. On the 12th day of December, 1900, it seems
the negotiations were about being brought to a close and
the sale consummated; Moore and McKinley were called in
from the field, whether on that day or on the 10th or 11th,
the evidence is somewhat conflicting, but the decided prepon-
derance of evidence is that they were called for over the
telephone about noon of the 12th and went to Clarksburg after-
noon, on that day. Both Moore and McKinley testify posi-

tively that it was on the 12th and are fully corroborated by Mrs. Clara A. McKinley, wife of plaintiff, and by Owen Moore, son of J. H. Moore, who caught his father's horse for him in the afternoon for his father to ride to Clarksburg, that he returned home the next evening or night, having sold his interest in the options. And J. W. Coffman says McKinley and Moore came to his office one evening or night between eight and nine o'clock and he tried to secure an option on the Jarvisville coal field, which they represented and the same evening Mrs. McKinley called him on the 'phone and said George had left home about one o'clock and asked him if he had arrived or whether he had seen him. It is not disputed that their interview with Coffman was on the same night of the contract between McKinley and Lynch, thus McKinley and Moore are further corroborated by this circumstance which places it beyond doubt that they were called in on December 12th, and not on the 10th or 11th. On the 10th day of December, J. C. Menoher sent a telegram to Peter I. Lynch: "Coal field sold subject to examination before fifteenth. Answer. Collect." And on the 10th the following telegram: "Can my parties have coal at twenty-two? Answer immediately." To which Peter I. Lynch answered same day: "Will parties close deal to-day at the price you state? Answer." And on the 11th the following telegram was received by Lynch from Menoher: "Am closing at twenty-two. Can option be sent here upon notice?" To which Lynch answered, "Must know by noon to-morrow if deal is closed. Buyers here, cannot send options." And on the 12th the following telegram was received by Peter I. Lynch from J. C. Menoher: "Am closing deal. Send one representative copy of option." These several telegrams indicate an immediate consummation of the sale, and defendant in his defense claims that McKinley and Moore were summoned in to consult about the telegrams and negotiations concerning the sale. It is alleged by plaintiff that these several telegrams were never shown him and Moore, and that at the time he made the contract with Peter I. Lynch for the sale of one-half his interest that he did not know that the sale was being consummated; had never seen or heard of the said telegrams. The testimony of plaintiff is positive that the four several telegrams were never shown to

him nor was he informed of their existence. He testifies
that on the 12th of December, 1900, he received a tele-
phone message from defendant to bring James H. Moore and
come to Clarksburg; that they arrived about dark and went
to T. J. Lynch & Co's. store and after a short talk with Mr.
Lynch and Mr. Elliott inquired the business they were sum-
moned in on. Mr. Lynch said they would have to look after
some of the options that would soon expire and wanted to
know if they could be extended. "I asked him if there was
any show to sell the field; if he had heard anything that had
encouraged him, and he said he hadn't, but he thought maybe
the coal would sell some time, he didn't know when; said
there was one J. W. Coffman who was taking options on
some pieces of coal, claimed he had a man that would buy
coal  *  *  *  *  After Mr. Lynch told me that it was
rather discouraging, I went out to John W. Coffman's office
and he said he would like to have an option on this coal."
That he asked Lynch if he had any information to lead
him to believe that the coal field would be sold and he said:
"You know as much as I do about that. I have no informa-
tion whatever;" that Lynch then said the only way they
could make money out of this, he believed, was to trade
among themselves; that he then proposed to buy the interest
of plaintiff, who told him he would not sell all his interest,
but would sell half of it; that he remarked to the defendant,
"Mr. Lynch, I am not in a position to deal with you, you
have been doing the correspondence with the coal buyers; I
have not been doing any of this correspondence, this coal
field might be sold or about to be sold and I have no knowl-
edge of it and you might have this knowledge." That
Lynch then said that he had no knowledge of the field being
sold; that plaintiff then sold to him one-half interest at
$500.00. Witness stated that as soon as he closed his con-
tract and signed it up, it was proposed to buy out J. H.
Moore, he thinks, by T. J. Lynch, and he thinks they had a
trade that night. He said he asked the defendant where the
contract was that they had made with J. C. Menoher; he said
he didn't know; it was misplaced and he couldn't find it; he
supposed it was lost; that he asked for it before he made the
sale of his interest. The next morning when he went to the
store about 9 o'clock Elliott and the defendant were reading

the contract which was claimed to be lost the night before, when Elliott said: "Boys none of us had any sense, this coal has been sold ever since we made this contract;" that he asked where they found the contract and Elliott said that it was out at his house; that he had laid it away and not able to find it until that night, which explanation was made in the presence of the defendant. Witness was asked what other business in relation to the field did Lynch and Elliott have for him and Moore that evening after or before the sale of their respective interests had been made, and he stated that he had no recollection of any other business that they had with them. Witness was asked about the telegrams that are hereinbefore copied and stated that he did not see them nor was he informed that there were any such telegrams. When asked if these telegrams had been shown or he had been advised of such negotiations would he, or not, have sold his one-half interest to Lynch as he did on the 12th. "A. I would not. A man would certainly be a very poor business man to sell six or seven thousand dollars sure money, for five hundred dollars." James H. Moore, one of the partners and who operated in the field with plaintiff McKinley fully corroborates the testimony of McKinley in regard to the time of their being summoned to Clarksburg on the 12th day of December, 1900, that on their arrival in the evening of that day they put up their horses, got their supper at a boarding house and went from there to T. J. Lynch & Co's. store and remained there the most of the time till 11 o'clock, or a little after, that night, that Mc-Kinley, Peter I. Lynch, C. D. Elliott, Truman J. Lynch and George Lynch were in the store; that they went there after dark. He stated that after they had been in the store a little while McKinley asked defendant Lynch something about the coal business, how he was getting along and what he had called them down for. He said something about options that would expire in the next month and he thought they had better talk over the matter and see what arrangements they could make, that was about all the business he heard. McKinley asked Lynch if he thought there was a prospect to sell. He said he thought there would be; he thought the coal would sell, but didn't know when. Lynch told McKinley that he had worked a good while in the field

and had been to a right smart of expense and he would like for him to get some money out of it; that Lynch said about the only way he knew to get anything out of it was to be like the farmer's boys, would be to go to trading among themselves. "He said a farmer had some boys that would go to the barn on rainy days and would trade jackets among themselves and make two or three dollars apiece;" that the next thing he heard Mr. McKinley and Mr. Lynch were talking of buying one another out. "I heard Mr. Lynch offer Mr. McKinley $100.00 for his interest, and the next I remember hearing he was offering him a thousand dollars for his entire interest, less what he had received from Mr. Menoher, Mr. McKinley told him that he wouldn't sell his entire interest at all, but told Mr. Lynch that if he hadn't any more information of the prospect of a sale than he had that he would sell him one-half of his interest. Mr. Lynch told him that he had not, and told Mr. McKinley that he knew everything about a sale that he did. Mr. Elliott then said that was the thing to do for McKinley to sell half of his interest for he didn't want to see Mr. Lynch lose his money and didn't want George to go clear out of the deal. Mr. McKinley sold to Mr. Lynch one-half of his interest for $500.00, I think." Says he was present when the contract between McKinley and Lynch was drawn up and signed. He thinks it was close to 11 o'clock. Before the contract was signed up between McKinley and Lynch witness and McKinley asked Mr. Lynch to show them the contract between the partnership and J. C. Menoher. He said he could not do it; didn't have it; that it had got misplaced some way and he thought it was out at C. D. Elliott's house. Mr. Elliott said he didn't think it was, but didn't know where it was; that the next morning they went back to the store of T. J. Lynch & Co. together and C. D. Elliott was sitting on the counter with the contract in his hand. "He said we was all fools, that the coal was sold when that contract was drawn up. He handed me the contract. I read the contract and told him, 'yes I considered it sold when that contract was drawn up. I told him I had forgotten exactly how that contract read, that if I had seen the contract before that I would have *knowed* better how to have done business.'" Witness Moore was shown the telegrams, numbered 11, 12, 13 and

14, and asked to state when he first saw or heard of such telegrams. A. "The first I ever saw or heard of these telegrams was on the 27th day of November, 1902." That he, together with George C. McKinley, went to Mr. Sperry's office when Mr. Sperry handed him this paper and asked whether he knew anything about these telegrams.

Q. "Were these telegrams or any of them produced, mentioned or referred to by Peter I. Lynch, or any one else, on the 12th day of December, 1900, when you and McKinley sold your interest?"

A. "There positively was not."

No parties connected with this transaction have a better right to a positive opinion as to the date that McKinley and Moore were called from the field to Clarksburg, than they. They had a ride through the cold rain on horseback, about 18 miles and when they reported at the store to defendants Lynch and Elliott and inquired the purpose of their being summoned in they were told that it was in relation to some options that would run out in the next month, that they thought ought to be looked after. There could have been but two objects on the part of Elliott and Lynch in calling these men to Clarksburg; one was as they claimed, to consult with them about the telegrams, and the closing up of the sale through Menoher; while the other purpose, would be to buy the interests of McKinley and Moore before they would discover the fact that the sale was about to be consummated. If McKinley and Moore are to believed the latter purpose is the one that moved the defendant to summon them in. It is hard to conceive that with the knowledge of those telegrams any sane man would have disposed of his interest, the value of which was a mere calculation of the difference between fifteen and twenty-two dollars per acre on about ten thousand acres, for five hundred dollars. There is an effort made to prove that they saw the telegrams, the first three, at least. The defendant, Peter I. Lynch, in his testimony says: "I believe that Mr. McKinley seen all those telegrams that were received. He seen those that had come in before he come to town and those that came in afterwards, he likewise seen or had an opportunity to see." He said his rule was, during this transaction, in all communications that he had with Mr. Menoher or any one else, that the very first opportunity

when Mr. McKinley and Mr. Moore would come to town or into the store where the correspondence and telegrams were kept they would all be showed to them and when he was there he generally showed them, and when he was not his sons, T. J. and G. G. Lynch, and Mr. Elliott, that he always insisted on them that they would keep them posted on everything that was done, "So I believe on this occasion, that he seen all the telegrams that had come in there as soon as opportunity offered they could be shown to him." He was asked if he showed Moore and McKinley the telegrams numbered 11, 12, 13 and 14, in person. He replied "I don't believe I did."

George G. Lynch was examined as a witness for the defendant, a partner in the firm of T. J. Lynch & Co.; was asked to state whether Mr. McKinley, at any time saw the papers or any of them that witness then had in his hand, being the originals of the correspondence of J. C. Menoher and Peter I. Lynch, or Lynch and Elliott, and if so who showed them to him. "Yes, he has seen them. He was shown by different parties. T. J. Lynch and myself, that's all I know of." On the cross examination: "You did not show to McKinley all of these letters and telegrams yourself, did you?" A. "I did not." Truman Lynch testifies: Q. "The plaintiff in his deposition in this case says, 'I did not see the telegrams 11, 12, 13 and 14, on the 12th day of December, 1900.' State what you know as to whether or not he did see them on that day? A. I handed Mr. McKinley, myself, at the the desk in our store telegrams 11, 12 and 13, and saw him read them. I am not sure who handed him number 14." Witness says, "I handed him on that day, when he first came in the store, numbers 11, 12 and 13, with possibly some other correspondence. This other telegram, 14, coming on the evening of the 12th, could not have been handed to him in the morning when he came in." The telegram, 14, is dated 12:14 P. M. The evidence is clear that McKinley and Moore did not reach Clarksburg until late in the evening, so that the first opportunity they could have had to have seen any of those telegrams must have been several hours after the receipt of the last, number 14, and if it is true that T. J. Lynch showed them the telegrams, numbers 11, 12, and 13, why was not 14 showed to them at

the same time? It must be remembered that T. J. Lynch, that same night, purchased the interest of Moore at a heavy discount, and he was of course interested in concealing the facts from Moore and McKinley. C. D. Elliott, one of the partners testified that Peter Lynch, George Lynch, Truman Lynch and himself were in T. J. Lynch & Co's. store when Moore and McKinley came in; they talked a while about the coal field and he heard McKinley say to Lynch: "I have a chance to sell my interest." He gave Lynch to understand that he could get about $400 for his interest. Lynch says, "You aint thinking about taking it, George?" He says, "That is in sight." Mr. Lynch says "I don't want you to sell, George, but if you are going to sell I will give you more money." Then Lynch began to bid on the property and offered McKinley, $1,000 for his interest, minus what McKinley had received from Menoher. "Just then I told him to hold on, count me out, that I wouldn't be in that trade. I said Mr. Lynch, you shan't buy all of George's share, and George you shan't sell all. Said I, we need George in to help keep the field in shape. Then some one said something about buying half of his interest and I told him I didn't care, that was all right as far as I was concerned. Then I went over close to Mr. McKinley. He wanted to know what I thought about the trade. I told him to do as he pleased about it; that I had nothing to do with the trade. Then him and Mr. Lynch commenced talking again. He asked Mr. Lynch if he thought he could sell the whole field. He says George, indeed I don't know. Then George says 'Maybe you know more about it than I do.' Mr. Lynch says, 'No, I told you all I know about it.'" "Then Mr. Lynch bought Mr. McKinley's half interest. I believe it was $500.00 that he paid." On cross examination Mr. Elliott was asked: "On the 12th day of December, 1900, when Peter I. Lynch was trying to get an option or a contract for his son Tillman J. Lynch of this coal field did he tell Mr. McKinley that Menoher already had the coal field sold, and was closing the contract for it? A. My recollection is that Truman Lynch is the one that was getting this contract signed for his brother Tillman. Mr. Peter Lynch didn't tell Mr. McKinley that in my presence." On cross examination Elliott was asked if McKinley did not ask for

the contract with Menoher and what Peter Lynch said about it? A. "He told him he did not know where it was. That it had gotten lost or something had become of it; and that he did not know where it was. Just as nigh as I remember." That Peter Lynch did not produce the contract or show it to McKinley on that day. He says he brought the Menoher contract from his residence to Clarksburg the first time he came in after the 12th of December.

This Menoher contract inquired for by McKinley and which could not be produced at the time he sold his one-half interest to P. I. Lynch, and which is a part of the record, but was found that night and seen by McKinley in the store the next morning, is the contract of September 12, 1900, before referred to and which contains the following further provisions:

"In case such sale is made as herein provided the parties hereto are to have an equal one-fifth (1-5) of the net profits derived from such sale; and provided that in case such sale is not effected before the expiration of any such options said Lynch, Elliott, McKinley and Moore are to diligently endeavor to secure the extension thereof for as long a time as may be had or on such of them as such extension may be obtained to such an extent as to command or control the said field. The money necessary for that purpose to be furnished or advanced by the said Menoher & Company, and with the further understanding and agreement that such sales shall be upon the terms and conditions and subject to the said reservations as are contained in the original options or leases."

"Such sale shall include all of the coal optioned for which good and sufficient title can be made, excepting such parts thereof as may be reserved under the original option, and shall also include any other adjacent or contiguous coal that may hereafter be optioned by the said first party at a price not in excess of Twenty Dollars ($20.00) per acre."

If the purpose of the defendant and Elliott was to withhold from McKinley and Moore, the telegrams numbered 11, 12, 13, and 14 about the same reason existed for withholding this Menoher contract. It is somewhat significant that the contract could not be found before, but was produced immediately after the sale of the McKinley and Moore interest. It appears from the record that Elliott and Lynch were part-

ners in all transactions relating to dealings in coal and speculations. Mr. Elliott testifies, on cross examination: "Something like two or three years before McKinley, Moore, P. I. Lynch and myself entered into this coal deal Peter I. Lynch and I entered into a contract as partners. This contract stated as I remember, that what moneys necessary to carry on any business we might be into, any profits arising from any trade we might have was to be divided equal and on this night this trade was had between Peter I. Lynch and George C. McKinley this was one of the reasons why I objected to Mr. Lynch buying Mr. McKinley's interests, knowing if I didn't object at that time if Mr. Lynch went on and made the trade without my objections that I would be equal partner. At that time I didn't have the money myself to pay my part, didn't want to go in debt for it but knowing if Mr. Lynch did buy it and I did not object that he would have to furnish the money and that time I did not feel interested. At that time I told Mr. Lynch to count me out. I told Mr. McKinley that I had nothing to do with the deal. He asked what I thought about the deal and I told him to do as he pleased, that I was not in it. Nor haven't been since." He further states that the contract was in writing; that they had never destroyed it and that they were still partners in coal business and in a farm and some oil; and stated that he considered himself a partner in the deal with McKinley up to the time he told him to count him out. Peter I. Lynch, and his brother-in-law, C. D. Elliott, were the partners who had charge of the correspondence in the negotiations for the sale of the property. This gave them an advantage over McKinley and Moore in the fact that they had the correspondence and negotiations in their own hands and had a better opportunity of knowing the value of the interests of the several partners than McKinley or Moore. There had been some correspondence between Menoher and Peter I. Lynch with reference to the purchasing of the interests of some of the partners. Lynch and Elliott were in a position where the temptation would be strong to suppress communications for the purpose of making an advantageous deal for the interests of members who were not so fortunate in being possessed of the knowledge of the then, rapidly closing or consummation of the sale of the property optioned, which was finally con-

summated on February 6, 1901, except as to the details of preparing the papers, etc.

In 1 Bigelow on Frauds, page 262, it is said: "It is difficult to define the term 'fiduciary relation;' but it will probably be safe, without excluding other possible cases, to say that such a relation arises wherever a trust, continuous or temporary, is specially reposed in the skill or integrity of another, or the property or pecuniary interests, in the whole or in part, or the bodily custody, of one person, is placed in the charge of another. For the protection of the former, the law raises the suspicion or presumption that the transaction between the parties has been effected through undue and illegal means by the latter,—that the party in the superior position has used that position to the injury of the party in the inferior situation; and this suspicion or presumption must be overcome, if the transaction be impeached, before the superior party in the situation can retain the benefit received." In Kerr on Fraud and Mistake, page 182, "The principles which cover the cases of dealings of persons standing in a fiduciary relation apply as between partners, between principal and surety and generally to the case of persons who clothe themselves with the character which brings them within the range of princpal, * * * the principle on which a court of equity acts in relieving against transactions on the ground of inequality of footing between parties is not confined to cases where a fiduciary relation can be shown to exist, but extends to all the varieties of relations in which dominion may be exercised by one man over another and applies to every case where influence is acquired and abused, or where confidence is reposed and betrayed." And cases there cited. In *Goldsmith* v. *Eichald*, 94 Ala. 116, at page 119, the court says: "These properties of partnership render it eminently a relation of trust. All its effects are held in trust, and each partner is, in one sense, a trustee; a trustee for the newly created entity,—the partnership,—and for each member of the firm, who thus becomes a beneficiary under the trust. He is more; he is a trustee and *cestui que trust*,—a trustee so far as his own duties bind him; a *cestui que trust*, so far as duties rest on his co-partners. And it is sometimes said that each partner is both a principal and an agent,—a principal to the extent he represents his own

interest, but an agent only so far as he represents his co-partners." In Bigelow on Frauds, at page 311: "Where a partner intending to purchase the interest of his co-partner has had the special management of the business or the keeping of the accounts, * * * the intending purchaser must make a full disclosure of the extent and situation of the business, otherwise, the purchase will be liable to be avoided by the co-partner." And on page 312: "It is certainly the duty of partners toward each other to refrain from all concealment in the transaction of the partnership business. If a partner be guilty of any such concealment and derive a benefit therefrom, he will be treated in equity as a trustee for the firm and compelled to account to his co-partner. * * * The burden is upon him to justify the transaction, otherwise he is a trustee." And cases there cited. In *Right* v. *Duke*, 98 New York, 409, it is held: "The relation of partners to each other is one of trust and confidence and if some of the partners propose to buy the share of another partner in the busines, the intending partners having general charge of the operations of the firm, of its office and of its books, they owe their fellow the duty of fully disclosing the extent and condition of the business and the existence of all valuable assets." This proposition is well discussed by the court in that case at pages 417-18, where after citing many authorities including some that I have just cited, the court says: "There would be no advandage in multiplying authorities upon this subject, all tending to support the proposition that in their dealings, as between each other, partners must act with the utmost candor and good faith. This duty or obligation was not lessened in the case at bar by the fact that during the negotiations the relations between the partners became straightened, and until the relation was terminated the obligation remained."

The questions involved in this case are thoroughly discussed in the case of *Newcomb* v. *Brooks*, 16 W. Va. 32, where it is held, (syl. pts. 1 and 2): "A person, who occupies any fiduciary relation to another, is bound not to exercise for his own benefit and to the prejudice of the party, to whom he stands in such relation, any of the powers or rights, or any knowledge or advantage of any description, which he derives from such confidential relation." 2 "A purchase by a fidu-

ciary, while actually holding a fiduciary relation, of the trust-property, either of himself or of the party to whom he holds such fiduciary relation, is voidable at the option of the party to whom he stands in such a relation, although the fiduciary may have given an adequate price for the property and gained no advantage whatever." It is contended by counsel for appellee that this case is not applicable to the case at bar. I fail to see wherein it is not applicable in view of the authorities before cited and the uniform line of decisions which treat such business relations as those of partnership, as trusts and as fiduciary relations. Counsel for appellee admit that partners must deal fairly with each other; that they are agents for the partnership and for each other, but say that, "It clearly appears that if Lynch had not purchased half of McKinley's interest McKinley would have sold it to some one else for less than Lynch paid him for half and that therefore he is in better situation, or in no worse situation, at least, and should be held just as firmly by his contract in selling to Lynch as selling to anyone outside of the firm." This is, indeed, a most specious argument, while McKinley was entirely free to trade with outside parties as he chose and could have been held to his contract made with any one who was not in possession of all the facts, yet he was entitled to all the information and knowledge that any of the partners had in relation to the negotiations for the sale of the coal, and Lynch had no right to purchase without disclosing to McKinley all the information he possessed, nor had he a right to allow him to sell to another without giving him such information as he possessed. Lynch was by no means, justified in purchasing the interest of McKinley in view of the circumstances under which the sale was made. If McKinley had been in possession of the information that Lynch had it is not probable that he would have sold at the price he did, either to Lynch or to any outside party. Counsel for appellee in their oral argument, cite in support of their contention *Gedde's Appeal*, 80 Pa. St. 442, a case in which a partner sold his interest in the firm to his co-partners and then proceeding, about six years afterwards to rescind the sale, alleged that his interest had been reported by one of them as being of less value than it was. "*Held*: that as partner he had a right to examine the books etc., and not having availed himself of the means

of information he had no ground for relief." And, "Partners bought the interest of a fellow through a third person concealing that the purchase was for them. *Held*: that was not *per se* fraud." That was a case in which the partner sold his interest in a furnace which was doing an active business and the value of his interest was easily arrived at, simply by an examination of the books of the concern, to which plaintiff had the right of access, a case very different from the one at bar where the information was wholly under the control of the defendant, and he had it in his power to withhold or produce it. It is insisted by appellant that by reason of the gross inadequacy of price, fraud in the contract complained of is presumed, and cite, among other cases, *Lowe* v. *Trundel*, 78 Va. 62, where it is said: "Now, how was this accomplished? How did he succeed in getting these judgments worth over $1,450.00 for the grossly inadequate sum of $200.00? It is true that mere inadequacy of consideration will not of itself, be a sufficient cause for the rescission of a contract by a court of equity, where the circumstances of the case indicate that no unfair advantage has been taken by the purchaser. 2 Story on Contracts (5th Ed.) section 550. It is also true, however, that where, as in this case, the inadequacy of consideration is so gross as to shock the conscience and astound the judgment of a man of common sense, that it alone will create a presumption of fraud. 3 Minor's Inst., p. 120. "Starting, therefore, with this circumstance, which creates of itself a presumption of fraud, we are prepared to give full credence to the testimony of Jenkins, which shows that the appellant represented, in substance, to him that the judgments were worthless; that the plaintiff's attorneys had given up all hope of collecting them; that all the proceeds derived from the sale of the property had been paid out in satisfaction of other debts, and that there were six or seven thousand dollars of debts yet to be paid before these judgments would get anything." Inadequacy of price is much more gross in case at bar than in the Virginia case. In 3 Min. Inst., p. 222, in speaking of inadequacy of consideration, the author says: "Thus, when an inadequate consideration, accompanied by even slight cirumstances besides, showing concealment, misrepresentation, undue influence, and the like on the purchaser's part    *    *    *.    it is

potent, and, for the most part, irresistible, evidence of fraud and is usually fatal to the contract." In *Marlatt* v. *Warwick* 18 N. J. Eq. 108, it is held: "Inadequacy of price at a judicial sale is not of itself sufficient cause to avoid the sale unless so gross as to be proof of fraud or to shock the judgment and conscience." *Wilson* v. *Jordon*, 3 Wood's 642; *Insurance Company* v. *Hamilton*, 3 Cooper's Chy. 228, on page 231 the court discusses the question and cites many pertinent cases. *Bradford* v. *McConihay*, 15 W. Va. 732; *McConihay* v. *Sweeney*, 24 W. Va. 643; *Lallance* v. *Fisher*, 29 W. Va. 512; *Wood* v. *Harmison*, 41 W. Va. 376. Counsel for appellee rely principally upon the conflict of testimony and upon that principle established in *Smith* v. *Yoke*, 27 W. Va. 639, (syl. pt. 1), where it is held: "Where the decree sought to be reversed is based upon depositions, which are so conflicting and of such doubtful and unsatisfactory character, that different minds and different judges might reasonably disagree as to the facts proved by them, or the proper conclusion to be deduced therefrom, the appellate court will decline to reverse the finding or decree of the chancellor, although the testimony may be such that the appellate court might have pronounced a different decree, if it had acted upon the cause in the first instance." *Chrislip* v. *Teter*, 43 W. Va. 356, (27 S. E. 288). And in *Weaver* v. *Aiken*, 48 W. Va. 456, (37 S. E. 600), syl. pt. 1: "The finding of the court as to facts in issue, unless against the plain preponderance of the evidence is conclusive upon this Court." *Wolf* v. *Bank*, 50 W. Va. 689, (47 S. E. 243); *Poling* v. *Condon*, 55 W. Va. 529, (47 S. E. 279). While we, by no means, repudiate the rulings of this Court in the cases cited, and other cases holding likewise, the Court will not hesitate to reverse a decree where it is plainly wrong or against a clear preponderance of the evidence.

We think the plaintiff has clearly shown himself entitled to the relief prayed for in his bills, therefore the decree is reversed and the cause remanded for further proceedings to be had therein according to the rules and principles governing courts of equity, and in accord with the principles herein set for*th.

*Reversed.*