### McKINNEY v. BLACK PANTHER OIL & GAS CO. et al.*

(Circuit Court of Appeals, Eighth Circuit. March 25, 1922.)

No. 5574.

1. **Estoppel** ⬅68(1)—**One appearing in representative capacity estopped to deny appearance as such.**

   One who appeared in an action and was recognized by the court as guardian for an incompetent is estopped to deny or question that he appeared in that capacity.

2. **Insane persons** ⬅92—**One not entitled to intervene as guardian of incompetent party.**

   In a suit in equity between heirs, claiming the estate of a decedent, *held*, that an application to intervene by one claiming to be guardian of one of the parties, an incompetent, on the ground that another claiming to be her guardian had neglected to protect her rights, and had been a party to a disposal of her estate for a wholly inadequate consideration, was without equity.

3. **Equity** ⬅114—**Intervention held properly refused after decree.**

   In a suit in equity between persons claiming to be heirs of a deceased Indian, court did not err in refusing to permit one to intervene as guardian of one of the parties, an incompetent, after a decree had been entered, based on a contract or contracts having the approval of the

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Rehearing denied June 21, 1922.

Secretary of Interior, Indian officials, and the probate judge; there being a final and complete adjustment and settlement of the claims of the incompetent.

**4. Attorney and client ⬤═155—Counsel of one claiming to be guardian of incompetent held not entitled to compensation out of fund.**

Counsel employed on contingent basis by one claiming to be guardian of incompetent Indian, claiming as heir of an estate of a decedent, *held* not entitled to compensation for services out of the sum adjudged to the incompetent under a settlement contract approved by the Secretary of Interior, the decree providing that such sum be paid to the Superintendent for the Five Civilized Tribes for the use and benefit of such incompetent; property involved being an allotment and proceeds of oil taken therefrom during the litigation.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Frank A. Youmans, Judge.

Bill by United States to cancel an allotment to Barney Tholocco, in which the Black Panther Oil & Gas Company and others became interested. From an order denying him the right to intervene as guardian of Martha Jackson, W. E. McKinney appeals. Cause remanded, with directions to modify decree.

See, also, 273 Fed. 113; Saley v. Black Panther Oil & Gas Co., 280 Fed. 496.

Sid White, of Okemah, Okl. (Robert J. White, of Paris, Ark., on the brief), for appellant.

C. Guy Cutlip, of Wewoka, Okl. (R. C. Allen, of Tulsa, Okl., on the brief), for appellee Parmenter, as guardian.

Charles B. Stuart, of Oklahoma City, Okl. (James H. Gordon, of McAlester, Okl., Joseph C. Stone, of Muskogee, Okl., and M. K. Cruce, of Oklahoma City, Okl., on the brief), for all other appellees.

A. J. Ward, of Tulsa, Okl., Creek National Atty., for Martha Jackson.

Charles A. Houts, of St. Louis, Mo. (W. W. Pryor and W. N. Stokes, both of Wewoka, Okl., Charles A. Dickson and George M. Swift, both of Okmulgee, Okl., Conrad H. Syme and J. W. Beller, both of Washington, D. C., and Owen C. Becker, on the brief), pro se.

Before LEWIS, Circuit Judge, and TRIEBER and POLLOCK, District Judges.

LEWIS, Circuit Judge. This is McKinney's appeal brought from an order denying him the right to intervene in the pending cause as guardian of Martha Jackson, a full blood Creek Indian. The litigation to which he sought to become a party in his claimed representative capacity was of long standing, and had its inception in a bill brought by the United States to cancel an allotment made by the Dawes Commission to Barney Tholocco, a citizen by blood of the Creek Tribe. See United States v. Bessie Wildcat et al., 244 U. S. 111, 37 Sup. Ct. 561, 61 L. Ed. 1024. That suit was begun on November 1, 1913. Before that a like suit had been brought by the United States in February, 1911, against the unknown heirs of Tholocco, and in July, 1911, a decree cancelling the allotment, ordering that the 160 acres be restored to the Creek Na-

tion, and that it be sold on advertisement, was entered pro confesso. In June, 1913, J. Coody Johnson, an attorney at law, entered into a written contract with Saber Jackson as guardian of Martha Jackson, by which Jackson employed Johnson to manage, conduct and prosecute a suit in behalf of Martha Jackson as the sole heir of Barney Tholocco for the recovery of the 160-acre allotment. If Johnson should succeed in establishing the sole heirship of Martha, it was agreed that he should have an oil and gas lease on the land; if he failed, he would get nothing for his services. In August, 1913, Jackson as guardian gave to Johnson the oil and gas lease, which was approved by the probate court. Thereafter Johnson succeeded in getting the pro confesso decree set aside; whereupon that suit was voluntarily dismissed and the United States at once filed its bill in this cause and lost its case on final hearing. 244 U. S., supra. Martha Jackson, a minor, and Saber Jackson as her guardian and next friend, were made defendants in this suit. It was charged that she and fifteen others named, who were made defendants, were the sole heirs of Barney Tholocco. J. Coody Johnson and Black Panther Oil & Gas Company were also made defendants. Johnson had assigned his oil and gas lease to that company and was interested in it. Pending the appeal, and before the final determination of the cause against the United States, a large number of other persons had come in by intervention on the claim that they were heirs of Barney Tholocco, and before that question was finally passed on by the trial court there were almost two hundred Indians who set up that relationship. The only issue in the case after the bill was finally dismissed as to the United States, on February 11, 1918, under mandate, was the question as to who was the heir or heirs of Barney Tholocco. Pending the appeal oil and gas were discovered in the vicinity of the tract in litigation. It was realized that the extraction of those minerals from adjoining lands would drain the allotment, and at the request of all parties to the cause the district court appointed a receiver and directed him to give an oil and gas lease on the allotment pending the controversy. With the approval of the court he gave a lease to the Black Panther Oil & Gas Company, which required that company to pay to the receiver one-fourth of the amount or value of the gross production which it might make and obtain under the lease, and as consideration therefor the lessee should have the other three-fourths. The land proved to be of great value in the oil that could be produced from it, the one-fourth of which that had been paid over to the receiver by the lessee at the time the trial court made its final determination of heirship, amounted to more than $1,000,000. In the late winter of 1898 and 1899 smallpox prevailed in the Creek Nation. The Federal authorities provided camps for the detention and treatment of those who were infected. It appears that Barney Tholocco and his entire family were treated in one of these camps. He had two sons and a daughter. His son John was married and had two children. Barney and all of his children, and his two grandchildren, died from the scourge within a short space of time; the only survivor being Annie, wife of his son John. Annie, who died later, married Saber Jackson, and Martha is the only child of that marriage. It was a question as to whether the

other son was married, and if so, did his wife survive him. The dates of the respective deaths of Barney Tholocco and his children and grandchildren were contested questions between those claiming as heirs. It was realized by all who asserted heirship that it was impossible to obtain certain and definite proof of these dates, and there was chance of casting the lines of descent in many different ways. The trial court in its opinion finally brought them down under the proof to five different classes of heirs. Martha admittedly was not of the blood of the common source. Her case at best was a doubtful one, both in fact and law, and the multitude of claimants put upon her and those representing her a great, if not impossible, burden to establish that she was the sole heir.

Saber Jackson, who was the guardian of Martha and named as such in the original bill of complaint, was removed by an order of the probate court in which he was appointed, and Lafayette Walker appointed in his stead. Later Walker was removed and R. W. Parmenter was appointed in his stead, and he, after his appointment and throughout the trial, appeared in the cause as the legal representative of Martha. In July, 1917, Parmenter as guardian, in apparent compliance with the State statutes and permissible Congressional Acts, obtained the proper orders from the probate court of Seminole county, which had appointed him, authorizing him to sell the interest of Martha Jackson in the allotment, and in the accumulated royalties, for $12,000 paid down, plus 25 per cent. of the share of the royalties to which she might finally become entitled by the decree of the court in the pending controversy, subject to certain charges, but in no event to be less than $25,000 additional. The probate court found that the interest of Martha Jackson in the property was indefinite and uncertain, that there were then about seventy-three other persons claiming to be the sole heirs and only owners of the property, that Martha's father was unable to support, maintain and educate her, that she did not have sufficient income for that purpose, and that it was necessary to sell her interest in the allotment and the impounded royalties in order to obtain funds to support, maintain and educate her. The guardian's deed, on the terms stated, was approved by the court, and the $12,000 therefor paid over by Thomas Kelly, the purchaser. At the same time, and as part of the same transaction, Kelly entered into a contract with the guardian, by which he agreed to prosecute the establishment of Martha's claim in the allotment, for the purpose of obtaining for her the largest interest possible as an heir thereto, and in the impounded royalties, and to pay to her 25 per cent. of those royalties to which she might become entitled, either by decree or compromise of the suit, and that the minimum sum so to be paid should not be less than $25,000 net, and to give a bond in the sum of $25,000 for the performance of his agreement. The guardian's deed assigned to Kelly the impounded royalties on the terms noted. One of the objections raised by McKinney is that the probate proceedings just noted were not in compliance with the State statute, which requires that the full consideration on the sale of a minor's real estate shall be paid down. But the accumulated royalties were not real estate; and while the proceedings in probate coupled together the $12,-

000 which was paid down and the contingent amount that Martha would receive out of the impounded royalties, as consideration, yet it is apparent that they were dealt with separately, the $12,000 being taken as consideration for her interest in the land, and the amount which she should receive out of the royalties was secured by Kelly's contract with the guardian and his bond to be given for its performance. The Congressional Act referred to above is the Act of May 27, 1908 (35 Stat. 312), section 9 thereof in part reading:

"That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, That no conveyance of any interest of any full blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee."

Kelly was acting in the purchase for three individuals who were largely interested in the Black Panther company, to-wit: James Brazell, O. O. Owens, and J. Coody Johnson. Lafayette Walker then held the position of U. S. Probate Attorney, and he appealed to the district court of the State from the order in probate directing and approving the sale and conveyance to Kelly. We take it that Walker was the appointee of the secretary of the interior, and made such under Section 6 of the Act of May 27, 1908. It may be that that section contemplated only the interest of allottees (adults or minors), but there is ground to claim that it included also the interest of minor heirs of allottees. The Act makes it the duty of such a representative of the secretary to safeguard those interests and to take such steps, civil or criminal, as will preserve the property. It also requires him to make full and complete reports to the secretary. The jurisdiction of the probate court to deal with the impounded royalties was questioned. This court later, in U. S. v. Hinkle (C. C. A.) 261 Fed. 518, following Parker v. Richard, 250 U. S. 235, 39 Sup. Ct. 442, 63 L. Ed. 954, held that that power rested solely with the secretary of the interior. Pending the appeal taken by Walker, a contract was entered into on May 11, 1918, between Kelly and the Black Panther company, on the one side, and R. W. Parmenter as guardian of Martha Jackson, on the other side, in which the terms of the purchase by Kelly were recited, and it was agreed that if Martha Jackson should be adjudged, either by the court or by settlement between the parties in the cause, to be the owner of the allotment of Barney Tholocco, that there should be paid to her $111,678.74, in addition to the $12,000 which had been paid, and that she should receive an additional sum equal to 25 per cent. of one-eighth of the proceeds derived from the sale of oil and gas from March 31, 1918, up to and including the determination of her interest, said 25 per cent. of said one-eighth to be subject to any claim for expenses in the administration of the receivership and overpaid royalties by the lessee of the receiver that might be allowed by the District Court, and that after her interest in the allotment was finally determined, nothing further should be paid to her. Kelly and the Black Panther company further agreed that they would

"immediately, faithfully and diligently undertake to purchase at their own cost and expense all claims adverse to Martha Jackson, and that all claims

which they may purchase, or have purchased, or contracted to purchase, * * * will be merged with the claim of Martha Jackson, and should any claim which has been, or may be purchased, or contracted to be purchased by them, the said Thomas Kelly and Black Panther Oil & Gas Company will agree in behalf of said claimants to a decree adjudging Martha Jackson the owner of said allotment, or should the decree be entered in favor of any such claimant, it is agreed that such claim or claims shall inure to the benefit of Martha Jackson in determining her rights under the said order, decree and contract of July 9, 1917." (The order, decree and contract approved in probate for the sale of Martha's interest to Kelly.) "Thomas Kelly and Black Panther Oil & Gas Company further agree that as against such claims as they are unable to purchase they will at their own expense diligently and faithfully aid and assist the representatives of Martha Jackson in establishing and maintaining her claim of ownership to said allotment."

This contract was approved by the Creek National Attorney. Before it was executed the superintendent of the Five Civilized Tribes, the Creek National Attorney, and Lafayette Walker, Probate Attorney, joined in a report to the Commissioner of Indian Affairs in which they recommended that the offer in the contract in settlement of Martha Jackson's interests be accepted. The Commissioner assented. The contract required a bond on the part of Kelly and the Black Panther company in the sum of $125,000 for its faithful execution. That bond was given and approved by the Judge of the U. S. District Court in which the controversy was then pending. After this contract was executed the appeal taken by Walker from the order of the probate court to the State district court was dismissed. The Black Panther company at once took up the execution of this contract on its part. The trial judge says in his opinion that the collateral heirs made strenuous efforts to defeat the Jackson claim and that the Black Panther company had obtained conveyance from all but one of them. That company asserts that it paid out more than $400,000 in settlement of claims adverse to the interests of Martha Jackson after entering into the contract, and that it turned to her benefit claims that it had theretofore purchased for large sums. After a lengthy trial final decree was entered June 17, 1919, in which the court found that Martha Jackson was on or before the 9th day of July, 1917 (being the day on which the probate court approved the sale to Kelly), the lawful owner and entitled to the possession of the 160 acres of land included in the Barney Tholocco allotment (subject, however, to the curtesy interest of Saber Jackson), and "to all royalties and income arising from said property and impounded in the hands of the receiver of this court." The decree then finds that on July 9, 1917, a guardian's deed conveying the land to Thomas Kelly was made and approved by the probate court, and that said court had jurisdiction and power to approve the same. The decree recites the contract of May 11, 1918, between Kelly and Black Panther Company of the one part, and R. W. Parmenter as guardian, of the other part, reference to which has already been made. It finds that on the 11th day of January, 1919, Kelly transferred and conveyed the property which he had acquired from Martha Jackson to Brazell, Owens, and J. Coody Johnson, and that they thereupon became the owners of the same and are entitled to the possession thereof, together with all royalties impounded and to be impounded in the hands of the receiver of

the court, subject to the amounts adjudged to be due Martha Jackson. The decree finds that a large number of defendants and interveners, about 180, naming them, have no right, title or interest whatever in and to the property, nor to the moneys and royalties derived from the same; and it thereupon ordered, adjudged and decreed James Brazell, O. O. Owens, and J. Coody Johnson to be the lawful owners and entitled to the possession of the property, together with all the royalties therefrom, and fixed the respective amounts due each, and that they were the owners of and entitled to the possession of all the moneys impounded and to be impounded in the hands of the receiver, subject to the claim of Martha Jackson for the sum of $111,670.74, "plus 25 per cent. of one-eighth of the proceeds derived from said lands between the 31st day of March, 1918, and this date," subject to one-eighth of the expenses and charges later set out in the decree. Other provisions of the decree need not be noted.

Martha Jackson reached her majority on May 10, 1919. On the preceding day the probate court of Seminole county, in a proceeding instituted for that purpose, found that Martha Jackson was an incompetent, being incapable of attending to her property and estate, and appointed R. W. Parmenter, her guardian during her minority, as guardian of both her person and estate, on account of her incompetency.

On June 17, 1919, the day the final decree was entered, and more than a month after the district judge had filed his opinion in the cause, W. E. McKinney presented to the court a petition of intervention by him as guardian of said Martha Jackson, an incompetent. She was at that time, and at all times during the preceding two years, represented in the cause by R. W. Parmenter as her guardian. McKinney in his petition of intervention attacked and challenged about everything that had theretofore been done in the cause on behalf of Martha, as unlawfully done, except the finding of the court that Martha Jackson was the owner of the allotment. He complained of the removal of Saber Jackson as her guardian and the appointment of Walker in his stead, of the removal of Walker and the appointment of Parmenter, of the sale in probate to Kelly as having been unlawfully made, of the contract of May 11, 1918, between Kelly, the Black Panther Oil & Gas Company, and Parmenter as guardian. He charged that the appointment of Parmenter as guardian of Martha Jackson as an incompetent was illegal and void, for reasons which he assigned, and alleged that he, McKinney, was appointed the guardian of Martha Jackson as an incompetent by the county (probate) court of Okfuskee county, Okl., and that that court was the only court that had jurisdiction to make such an appointment, and he asked that he be permitted to intervene as the guardian of Martha and that the court declare that all the transactions of which he complained, and the deeds, contracts and instruments to which he referred, dealing with the interests of Martha, that had theretofore been entered into by Parmenter in her behalf, be adjudged void and of no effect. The Black Panther company filed written objections to McKinney's petition of intervention, and among other things set up as part of it copy of an agreement made between McKinney as guardian of Martha Jackson, incompetent, and George M. Swift, an attorney

at law, on May 19, 1919, which was the day of McKinney's appointment, wherein McKinney purported as guardian of Martha Jackson to employ Swift as his attorney to bring the necessary suits to avoid and set aside the deeds and contracts referred to in McKinney's petition; and in consideration of the services thus to be performed by Swift, McKinney as guardian agreed that Swift should have "one-half of all property or money which may be recovered by him in any suit or suits filed by him, whether received upon any settlement or compromise, or upon judgment," and appointed Swift as his attorney with full power to settle, compromise and receipt for all money or property which might be recovered, either upon settlement or compromise or judgment, and to the royalties; and assigned, conveyed and set over to Swift an undivided half-interest in all sums or property to be recovered by him, and undertook to give to Swift and associate counsel a first lien upon the same. The court denied McKinney's application for leave to intervene. This appeal is from that order. For several reasons we think the court did not err.

[1] 1. On February 25, 1920, Parmenter commenced an original proceeding in the Supreme Court of Oklahoma as guardian for Martha Jackson, against McKinney and the judge of the county court of Okfuskee county, who undertook to make the appointment of McKinney as guardian, wherein he recited the facts touching his appointment as her guardian on May 9, 1919, by the county court of Seminole county, and embodied therein a copy of the entire record in the matter, and prayed that the writ of prohibition might issue commanding the respondents to desist and refrain from further proceedings in the matter of said guardianship of Martha Jackson. The court rendered a unanimous opinion on March 29, 1921, and denied a rehearing on September 13, 1921. In its opinion it held: (a) When the county court of Seminole county took jurisdiction, the same was coextensive with the state, and excluded the jurisdiction of the county court of every other county; (b) that the matter set up in the response, attacking the validity of the order appointing Parmenter, constituted a collateral attack upon the action of the county court of Seminole county and was not permissible; and (c) that the county court of Okfuskee county was without jurisdiction to act in the premises. See 200 Pac. 683. In response to this counsel for McKinney present here certified copies of proceedings later brought in the county court of Seminole county to obtain an order removing Parmenter, and also a petition filed in the Supreme Court January 20, 1922, in which an order recalling the writ of prohibition was prayed, and it is said that the writ will be or has been recalled and that the litigation between McKinney and Parmenter has not reached final determination. But we have no doubt of the soundness of the principles declared by the Oklahoma Supreme Court. Neither of them has a personal interest in this controversy; it was Martha's interest that was being dealt with. Parmenter appeared and was recognized by the court below in a representative capacity only, as Martha's guardian, and is estopped to deny or question that he appeared in that capacity.

[2] 2. This is a suit in equity. To let McKinney in on his claim that Martha had not been represented by anyone who had the right to appear for her, that Parmenter, under the pretense that he was her guardian and had gained the privilege of acting as such, had neglected to protect her rights, had permitted and been a party to a disposal of her estate for a wholly inadequate consideration, and that because thereof she was entitled to have all of those acts and transactions reviewed and adjudged void and to a decree that all of the royalties, subject to her father's curtesy therein, belong to her, is under the facts not asking for equity but inequity, unless coupled therewith there be an offer to compensate Parmenter, J. Coody Johnson, Thomas Kelly, and Black Panther Oil & Gas Company for their services in her behalf, and to pay back or account to them for all sums that had been paid out by them in establishing an interest in her to the allotment. Moreover, considering the interest of Martha at the time these transactions were being carried out, the uncertainty of establishing her claim to an interest in the allotment, the fact that she was without available means to prosecute that claim, and that she was confronted with a multitude in opposition, with many of whom it was necessary to make settlement at great cost in the aggregate for the protection of Martha's interest, convinces us that Parmenter's action was wisely taken and was greatly to the benefit of his ward; and that what he did should be commended and not condemned.

[3] 3. Furthermore, after the decree had been entered negotiations were brought about with the Secretary of the Interior as to the interest of Martha Jackson in the subject of the suit, and especially as to the royalties, which resulted in a contract of date October 22, 1921, as a supplement to the contract of May 11, 1918. The secretary had not expressly approved that contract. The contract of May 11, 1918, as thus supplemented, had the express written approval of the Secretary of the Interior. It modified the prior contract which had been approved by the trial court, by providing that Martha Jackson should receive out of the royalties reserved and in the hands of the receiver $308,000 in addition to the $12,000 that she had received for the sale of the land, and that that sum should be in full satisfaction of all claims whatsoever heretofore asserted and which may hereafter be asserted by or on behalf of the said Martha Jackson against the Black Panther Oil & Gas Company, James Brazell, O. O. Owens and J. Coody Johnson, and that that sum should go to Martha Jackson free from all charges for costs of litigation and administration of the property, and free from any claim which the Black Panther company or other parties to the contract might have or assert. It was further agreed that the contract of May 11, 1918, should in all particulars remain in full force and effect, except as thus modified, and that when it should be approved by the Secretary of the Interior it should be used as a basis for a stipulation between the parties providing for a modification of the decree entered on June 17, 1919. It also received the approval of the Creek National Attorney, the Special Supervisor of Indian Service and of the Probate Judge of Seminole county. This, we think, operated as a final and complete adjustment and settlement of the claims of

Martha Jackson, and that in the settlement she was represented by everyone who had lawful authority to speak and act in her behalf. For these reasons the order denying intervention to McKinney will be affirmed.

[4] After Swift made his contract with McKinney of date May 19, 1919, by which McKinney agreed to allow him one-half of all he might recover or receive in behalf of Martha Jackson, Swift employed Charles A. Houts and several other attorneys, who now appear with him in this cause. They filed briefs for the purpose of sustaining McKinney's appeal, but after that had been done McKinney discharged Swift, and now the counsel whom Swift employed as his associates represent that they gave valuable services in procuring the supplementary contract of October 22, 1921, and they ask that this court fix the value of their services and direct that whatever may be allowed them be paid out of the $308,000, or that in event this court remands the cause to the District Court for the purpose of reforming the decree in accordance with the supplementary contract, that the District Court be directed to fix and provide for the payment of a reasonable amount to them for their services out of said sum. Their employment terminated when Swift was discharged by McKinney, and McKinney, as we view the facts, had no authority to employ counsel and bind the estate of Martha Jackson therefor. But of more importance on the subject are the terms of contract in relation to the payment of that sum to Martha Jackson, which have already been noted, and in addition thereto, the approval of the Secretary of the Interior of that supplementary contract expressly provides that his approval is given "on the condition, however, that the sum of $308,000 provided therein to be paid shall carry with it the interest paid the receiver on said amount from date of approval hereof to date of final distribution, and that said principal sum and interest shall be paid to the superintendent for the Five Civilized Tribes for the use and benefit of Martha Jackson, to be held and controlled by said superintendent as are other restricted individual Indian moneys." The motion of Houts and others for allowance for their services out of said funds must, therefore, be denied.

After McKinney discharged Swift as his counsel he employed other counsel, who have appeared here in his behalf, and they have made several motions in the cause. Those motions will all be denied.

On execution and approval of the contract of October 22, 1921, all parties interested in the cause under the terms of the decree filed a motion in this court asking that this court reform the decree in accordance with the terms of the supplementary contract of October 22, 1921, or that it remand the case to the district court for that purpose. That motion will be sustained and the cause remanded to the District Court with directions that it change and modify the decree so as to comply with the terms of that contract, and in no other respect, and that it direct the immediate payment of said $308,000, and any interest that may have accrued thereon, to the superintendent for the Five Civilized Tribes, in accordance with the approval of said contract by the Secretary of the Interior.