COMMISSIONER OF INTERNAL REVENUE v. OWENS.

SAME v. BRAZELL.

Nos. 1074, 1075.

Circuit Court of Appeals, Tenth Circuit.

July 3, 1935.

F. W. Dewart, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and J. P. Jackson, Sp. Assts. to Atty. Gen., on the briefs), for the United States.

Maxwell M. Mahany, of Bartlesville, Okl., for respondents.

Before LEWIS and PHILLIPS, Circuit Judges, and KENNEDY, District Judge.

PHILLIPS, Circuit Judge.

The Dawes Commission allotted a tract of land in Creek County, Oklahoma, to Barney Thlocco, a full-blood Creek Indian, who died about the time such allotment was made. Oil and gas were discovered in Creek County, and on November 1, 1913, the United States brought a suit in the Dis-

trict Court of the United States for the Eastern District of Oklahoma against Bessie Wildcat and others claiming to be the heirs of Thlocco, to cancel the allotment and recover the lands embraced therein for the benefit of the Creek Nation.

On April 17, 1914, the District Court appointed a receiver for the property and directed him to lease the land, for the term of the receivership, for oil and gas purposes, at a royalty of 25% of the gross revenue and income, for the benefit of whomever might ultimately be determined to be the rightful owners of the property. On April 30, 1914, the receiver in accordance with the order, entered into a lease with the Black Panther Oil & Gas Company.

Between November 1, 1913, and May 3, 1915, approximately 225 persons, many of whom were Indians, entered appearances in the suit. Each set up that he was either an heir of Thlocco or the assignee or vendee of an heir.

On May 8, 1915, the court entered a decree against the United States adjudging that the allotment was valid. This decree was affirmed by the Supreme Court of the United States on May 21, 1917. See United States v. Wildcat, 244 U. S. 111, 37 S. Ct. 561, 61 L. Ed. 1024. This left for determination the question of the heirship of Thlocco. Among those who asserted claims of heirship were Saber Jackson, who claimed a life estate as tenant by the curtesy, and Martha Jackson his daughter, who claimed a fee simple title.

On July 6, 1916, Saber Jackson, in consideration of $10,000 in cash and an agreement to pay him an additional equal amount out of the impounded royalties, conveyed his interest by deed to one Morley, acting as agent for Owens, Brazell and Johnson. On August 6, 1916, Morley conveyed such interest by deed to his principals. On October 7, 1918, Owens, Brazell and Johnson conveyed such interest by quit-claim to the Black Panther Oil & Gas Company.

On July 9, 1917, Parmenter, as guardian of the estate of Martha Jackson, entered into a contract with one Kelly, acting as agent for Owens, Brazell and Johnson, whereby it was agreed that as such guardian he would convey her interest in such allotment and transfer her interest in the impounded royalties, and that Kelly, in consideration therefor, should pay $12,000 in cash and 25% of such of the royalties as should be adjudged to belong to Martha

Jackson, and should prosecute her claim and have decreed to her the largest possible interest in the allotment, and defeat or purchase all adverse claims. Pursuant to such agreement and in consideration of $12,000, Parmenter as such guardian conveyed her interest in the allotment to Kelly by deed dated July 9, 1917. On that date the county court of Seminole County approved and ratified such deed. See McKinney v. Black Panther O. & G. Co. (C. C. A. 8) 280 F. 486, 489, 490. On July 24, 1917, Kelly transferred his interest to his principals, who assumed Kelly's obligations under the contract of July 9, 1917.

On July 9, 1917, the impounded royalties amounted to $698,836.89.

On February 26, 1918, Owens, Brazell and Johnson entered into a contract with the Black Panther Company. This contract recited the receivership, the lease by the receiver; a prior lease by Saber Jackson, and Martha Jackson by her guardian, for a one-eighth royalty; the assignment of the last mentioned leases to the Black Panther Company, and the acquisition by Owens, Brazell and Johnson of the interests of Saber and Martha Jackson in the allotment. It provided that Owens, Brazell and Johnson should receive one-half of the impounded royalties when distributed under the order of the court and an additional one-eighth of the oil and gas produced from the allotment, that the Black Panther Company should receive the other one-half of the impounded royalties when disbursed by the order of court, that the Black Panther Company should pay all expenses theretofore incurred or to be incurred in establishing the claim of Martha Jackson, and that after the discharge of the receiver, Owens, Brazell and Johnson should receive as royalty only one-eighth of the oil and gas produced. On February 26, 1918, the impounded funds amounted to $893,365.94.

In carrying out the obligations of Owens, Brazell and Johnson, $395,480.34 was expended by the Black Panther Company and its assignee, Bay State Oil & Gas Company. $315,274.10 thereof was expended in 1918.

On May 11, 1918, Owens, Brazell and Johnson acting through Kelly their agent, and the Black Panther Company entered into a supplemental contract with Parmenter, as guardian of Martha Jackson, which construed the contract of July 9, 1917, and provided that Martha Jackson should receive $111,870.74 of the impound-

ed royalties and in addition thereto one-eighth of the funds that should be accumulated by the receiver between March 31, 1918, and the date of the final determination of her interest by the District Court, and that Owens, Brazell and Johnson should purchase or attempt to defeat all claims adverse to Martha Jackson. A bond of $125,000 was given to guarantee performance of such contract.

On May 10, 1919, Saber Jackson with leave of court filed an intervening petition by which he sought to have his conveyance of July 6, 1916, set aside on the ground of fraud.

On June 17, 1919, the District Court entered a decree in which it adjudged that Martha Jackson was the sole heir of Thlocco, and, subject to the estate by the curtesy of Saber Jackson, on June 9, 1917, was the owner of such allotment and entitled to the royalties impounded up to that date.

It further adjudged that, by reason of the conveyances above mentioned, Owens, Brazell and Johnson were the owners of the allotment and the royalties impounded and to be impounded in the hands of the receiver, subject to the amounts due Saber and Martha Jackson and the equities of the Black Panther Company.

It found that the equities of the Black Panther Company and the Bay State Company could not be determined until the Saber Jackson intervention had been disposed of, and it reserved for future determination the rights and equities of Saber Jackson and the two oil companies.

On September 9, 1919, the court entered a decree dismissing the intervention of Saber Jackson.

About September 9, 1919, Martha Jackson filed an application to intervene and challenge the validity of her contracts and conveyances, on the ground of fraud. This application was denied.

In May, 1920, one Saley a Seminole Indian intervened and set up a claim that she was the sole heir of Thlocco. The trial court entered a decree dismissing her petition and that decree was affirmed by the Circuit Court of Appeals of the Eighth Circuit on March 25, 1922. Saley v. Black Panther O. & G. Co. (C. C. A. 8) 280 F. 496.

Saber and Martha Jackson appealed from the decree of June 17, 1919, and the orders of September 9, 1919, dismissing his petition in intervention and denying her leave to intervene.

While these appeals were pending, a supplemental contract was entered into between Martha Jackson, the Black Panther Company and Owens, Brazell and Johnson, whereby it was agreed that she should receive $308,000 of the impounded funds. On March 25, 1922, the Circuit Court of Appeals approved such contract, directed that the decree of the District Court be modified accordingly and as modified affirmed, and directed the District Court to pay out of the impounded funds $308,000 to the Superintendent of the Five Civilized Tribes for the use and benefit of Martha Jackson. McKinney v. Black Panther O. & G. Co. (C. C. A. 8) 280 F. 486.

On February 3, 1923, the Circuit Court of Appeals entered a decree finally adjudging the rights of Saber Jackson.

In September, 1922, $318,261.04 was paid out of the impounded funds to the Superintendent of the Five Civilized Tribes for the benefit of Martha Jackson.

On May 29, 1923, all interventions having been disposed of, a final decree was entered by the District Court ordering the distribution of the impounded funds. Owens received $202,523.30 and Brazell received $237,148.28 from such funds.

The commissioner included the above amounts in the gross income of Owens and Brazell for the year 1923, and proposed an additional tax of $54,221.92 against Owens and $32,381.80 against Brazell. Owens and Brazell filed petitions for redetermination with the Board of Tax Appeals. The board reversed the determination of the commissioner and held that the sums received by Owens and Brazell in 1923 were not income taxable to them in that year; and that the royalties received by the receiver constituted income that had accumulated in trust for the benefit of unascertained persons, and that the receiver should have returned and paid the tax on such income annually from September 8, 1916, the effective date of the Revenue Act of 1916, to and including the date when the ownership of the allotment and the impounded royalties was finally determined, under the provisions of the Revenue Acts of 1916, 1918, and 1921.[1]

---

[1] Section 2(b), Revenue Act 1916 (39 Stat. 757) in part provides:

"Income received by estates of deceased persons during the period of administration or settlement of the estate, shall be subject to the normal and additional tax

On July 9, 1917, Owens and Brazell acquired Martha Jackson's interest in the allotment and, subject to her right to receive certain payments therefrom, her interest in the royalties that had accumulated in the hands of the receiver up to that date.

The portion of the income that had accumulated in the hands of the receiver up to July 9, 1917, which belonged to Martha Jackson as sole heir, and a part of which was ultimately paid to Owens and Brazell, was received by them not because of their ownership of her interest in the allotment, but by virtue of their contracts of purchase.

The portion of the royalties that accumulated in the hands of the receiver after July 9, 1917, which belonged to Owens and Brazell as equal owners of an undivided six-eighths interest in the estate that had passed to Martha Jackson as sole heir, was income derived from the property of Owens and Brazell.

Therefore, that portion of the income that had accumulated in the hands of the receiver up to July 9, 1917, and which was paid to Owens and Brazell on the final distribution, was acquired and received by them by virtue of their contracts of purchase; while that portion of the income that accumulated in the hands of the receiver after July 9, 1917, and which was paid to Owens and Brazell on the final distribution, was income produced from their property and they received it by virtue of their ownership of such property.

Those portions of the accumulated funds in the hands of the receiver on July 9, 1917, which were paid to Owens and Brazell on final distribution in 1923, did not result in taxable gain to Owens unless it exceeded the cost of the estates and interests acquired by him under the contracts of July 9, 1917, and the contracts supplemental thereto, and did not result in taxable gain to Brazell unless it exceeded the costs of the estates and interests acquired by him under such contracts, because until they received back their costs they could not have realized any gain from such transactions, but only a return of capital. To the extent, if any, that such funds so paid to Owens and Brazell exceeded their costs, they realized a taxable gain in 1923. The record does not disclose sufficient facts to enable us to determine the amount of taxable income resulting to Owens and Brazell from such transactions.

With respect to the remainder of the accumulated funds received by Owens and Brazell from the receiver because of their ownership of the allotment, three questions are presented. (1) Were the funds that accumulated in the hands of the receiver after September 8, 1916 (the effective date of the Revenue Act of 1916), "income accumulated in trust for the benefit of * * * unascertained persons." (2) Was the receiver a fiduciary within the meaning of section 2 (b), Revenue Act 1916, and section 219, Revenue Acts 1918 and 1921. (3) Should income taxes have been assessed against the receiver annually on account of income that had accumulated in his hands from September 8, 1916, to the date the ownership of such funds was finally determined, and should the receiver have paid such taxes.

In resolving these questions it is important to keep in mind the status of un-

---

and taxed to their estates, and also such income of estates or any kind of property held in trust, including such income accumulated in trust for the benefit of unborn or unascertained persons, or persons with contingent interests, and income held for future distribution under the terms of the will or trust shall be likewise taxed, the tax in each instance, except when the income is returned for the purpose of the tax by the beneficiary, to be assessed to the executor, administrator, or trustee, as the case may be."

Section 219, Revenue Act 1918 (40 Stat. 1071) in part provides:

"Sec. 219 (a) That the tax imposed by sections 210 and 211 shall apply to the income of estates or of any kind of property held in trust, including—

"(1) Income received by estates of deceased persons during the period of administration or settlement of the estate;

"(2) Income accumulated in trust for the benefit of unborn or unascertained persons or persons with contingent interests;

"(3) Income held for future distribution under the terms of the will or trust; and * * *

"(b) The fiduciary shall be responsible for making the return of income for the estate or trust for which he acts. * * *

"(c) In cases under paragraph (1), (2), or (3) of subdivision (a) the tax shall be imposed upon the net income of the estate or trust and shall be paid by the fiduciary. * * * "

The provisions of Section 219, above quoted, were in substance re-enacted in Section 219 of the Revenue Act of 1921 (42 Stat. 246).

born and unascertained persons under the 1913 and subsequent acts.

The Supreme Court in Smictanka v. Bank, 257 U. S. 602, 42 S. Ct. 223, 224, 66 L. Ed. 391, held that, while the language of the taxing paragraph of the income tax act of 1913 (38 Stat. 114), indicated an intention "to tax citizens everywhere * * * including persons, natural and corporate," it did not include as taxpayers unborn or unascertained persons or make income held in trust for their benefit subject to taxation, and that the casus omissus was cured in the Revenue Act of 1916 which "specifically declared that the income accumulated in trust for the benefit of unborn or unascertained persons should be taxed and assessed to the trustee." The Revenue Acts of 1916, 1918 and 1921 did not make unborn or unascertained persons taxpayers, but provided that where income had accumulated in trust for such a person, the trustee should become the taxpayer, should return the income for taxation, and should pay the tax thereon. It follows that up to September 8, 1916, the effective date of the Revenue Act of 1916, income that had accumulated in trust for the benefit of unascertained persons, was not taxable, and after that date such income was taxable only against the trustee.

■ The New Century Dictionary defines unascertained as follows: "Not certainly known or determined." Webster's New International Dictionary defines ascertain as follows: "To find out or learn for a certainty by trial, examination, or experiment."

We are of the opinion that "unascertained persons," as used in the statutes here involved, embraces one who occupies a particular status, such as owner, heir, cestui que trust and the like, but who is not definitely known or determined.

■ At the inception of the receivership it was unknown whether the allotment belonged to the Creek Nation or to the heirs of Thlocco, and his heirs were likewise unknown. The Creek Nation was eliminated from the controversy on May 21, 1917, by the decision of the Supreme Court. Thereupon it became settled that the allotment and the income therefrom belonged to the heir or heirs of Thlocco. Approximately 225 persons claimed to be his heirs or an assignee or vendee of an heir, and the lawful heir or his successor was not ascertained or determined finally until the decrees of the Circuit Court of Appeals of the Eighth Circuit on March 25, 1922. On that date it was finally judicially ascertained and determined that the allotment descended to Martha Jackson as the sole heir of Thlocco, subject to an estate by the curtesy in Saber Jackson and that on July 9, 1917, Owens, Brazell and Johnson had acquired her estate, and, subject to her right to receive certain payments therefrom, her interest in the accumulated royalties.

Whether we view the situation as it existed prior to the decision of the Supreme Court of May 21, 1917, or in the light of that decision, it seems clear that the accumulated royalties in the hands of the receiver up to the date their ownership was finally determined, were held by the receiver for the benefit of unascertained persons. Up to May 21, 1917, it was unascertained whether the allotment and royalties belonged to the Creek Nation or to the unascertained heirs of Thlocco. Thereafter, until the final adjudications by the Circuit Court of Appeals on March 25, 1922, it was unascertained who of many claimants (one of whom, Saley, asserted her claim as late as May, 1920) was the heir at law of Thlocco.

We therefore conclude that the funds that had accumulated in the hands of the receiver up to March 25, 1922, were "income accumulated for the benefit of unascertained persons."

■ A receiver is a person appointed by the court to take the control, custody or management of property which is the subject-matter of or involved in litigation, to preserve the property, and to receive the rents, issues and profits thereof pending the ultimate determination of such litigation. Booth v. Clark, 17 How. 322, 331, 15 L. Ed. 164; Spring Valley W. Co. v. City and County of San Francisco (C. C. A. 9) 225 F. 728, 731; Pennsylvania Steel Co. v. New York C. R. Co. (C. C. A. 2) 198 F. 721, 728.

■ The term fiduciary is derived from the civil law. Smith v. Ogilvie, 127 N. Y. 143, 27 N. E. 807. It connotes the idea of trust or confidence. Stoll v. King, 8 How. Prac. 298, 299; Smith v. Ogilvie, supra; Bouvier's Law Dict. (Rawle's 3d Rev.) p. 1216. The relation arises whenever the property of one person is placed in charge of another. McKinley v. Lynch, 58 W. Va. 44, 51 S. E. 4, 9. "Fiduciary" is defined in section 200, Revenue Acts 1918 and 1921 (40 Stat. 1058; 42 Stat. 227), as follows:

"The term 'fiduciary' means a guardian, trustee, executor, administrator, receiver, conservator, or any person acting in any fiduciary capacity for any person, trust or estate."

We hold that the receiver was a fiduciary within the meaning of section 2 (b), Revenue Act 1916, and section 219, Revenue Acts 1918 and 1921.

■ The commissioner contends that the word fiduciary, as used in section 2 (b), Revenue Act 1916, and section 219, Revenue Acts 1918 and 1921, does not embrace a receiver in possession of only a part of the property of an individual, and that the receiver here was in possession of only a part of the property of Saber Jackson, Martha Jackson, Owens and Brazell; or at least it does not appear that he was in possession of all the property of such persons. He asserts that this is expressly provided by section 225 of the Revenue Acts of 1918 and 1921.[2]

It will be noted that section 2 (b) and section 219, supra, make "income accumulated in trust for the benefit of * * * unascertained persons" subject to income taxes annually, and such section 219 provides that the fiduciary shall make the return, that the tax shall be imposed on the net income of the trust, and that the fiduciary shall pay the tax. Therefore in such cases the trust is the taxpaying unit and the trustee is the taxpayer.

The purpose of such provisions is to provide for annual assessment and taxation of income that has accumulated in trust. Annual assessment and payment of income taxes are important elements in the scheme of federal income taxation. Woolford Realty Co. v. Rose, 286 U. S. 319, 326, 52 S. Ct. 568, 76 L. Ed. 1128.

Whether the trust as the taxpaying unit embraces all the property of the beneficiary is not known, because the latter is unascertained. If section 225, Revenue Acts 1918 and 1921, limits section 219, then "income accumulated in trust for the benefit of * * * unascertained persons" would always be excepted from the provisions of such section 219 in cases where the trustee was a receiver, because it could never be determined that the trustee was in posses-

sion of all the property of the unascertained person.

We do not think Congress intended section 2 (b) and section 219 should apply to all fiduciaries except receivers. On the contrary, we think section 219 (b), Revenue Acts 1918 and 1921, and section 225 of such acts are intended to apply to different situations; the former to a fiduciary holding income-producing property and receiving income for the benefit of unascertained persons, and the latter to a fiduciary holding income-producing property and receiving income therefrom for the benefit of a definitely known beneficiary— an existing potential taxpayer.

This view is strengthened, we think, when the scope of the sections is considered. Section 225 only deals with the return of a receiver, while section 219 provides generally for taxation of income received by a fiduciary of an unknown beneficiary, designating the trust as the taxpaying unit and the fiduciary as the taxpayer who shall make the return and pay the tax.

■ Furthermore, we think the purpose of the exception in section 225 was to eliminate two partial returns by the same taxpaying unit, one by the individual and one by a receiver of only a part of his property. Buckley v. Commissioner (C. C. A. 2) 66 F.(2d) 394. Of course, an unborn person could make no return, and an unascertained person could make no identifiable return.

We are of the opinion that the instant cases are distinguishable from North American Oil Cons. v. Burnet, 286 U. S. 417, 52 S. Ct. 613, 615, 76 L. Ed. 1197. There, the North American was operating a number of oil properties. The United States, holding the legal and claiming the equitable title to one tract, brought a suit to establish its title, oust the North American from possession, and obtain an accounting for the oil removed. On February 2, 1916, the United States secured the appointment of a receiver to operate the tract of land involved in the suit and to receive and hold the net income therefrom. In 1917 the District Court dismissed the government's bill. United States v. North American Oil Cons., 242 F. 723. Net profits earned in 1916 were paid to the receiver as earned.

2 Section 225, Revenue Act 1918 (40 Stat. 1074), reads as follows:

"That every fiduciary (except receivers appointed by authority of law in possession of part only of the property of an individual) shall make under oath a return."

It was re-enacted in substantially the same language in the Revenue Act of 1921 (42 Stat. 250).

When the bill was dismissed the receiver paid the money representing such profits to the North American. The commissioner included such amount in the North American's income for 1917. The Board of Tax Appeals held it was taxable to the receiver in 1916. There, the equitable title was in fact in the North American, an ascertained person, and its title was challenged by the suit brought by the government. It simply was a controversy respecting the title between two ascertained persons. Here, the title was admittedly in a person occupying a particular status, towit, the heir to Thlocco, but the identity of the person occupying that status was not determined. He was an unascertained person. There, either the land belonged to the North American and the income therefrom was a part of its gross income, or it belonged to the United States and was exempt. There, the court did not deal with section 2 (b), but with section 13 (c), Revenue Act 1916, 39 Stat. 770, 771, providing for returns of receivers of corporations, and held that, since the receiver was in charge of only a part of the property of the corporation and received only a part of its income, the receiver was not required to make a return. In the opinion the court said:

"The income earned in 1916 and impounded by the receiver in that year was not taxable to him, because he was the receiver of only a part of the properties operated by the company. Under Section 13 (c) of the Revenue Act of 1916, receivers who 'are operating the property or business of corporations' were obliged to make returns 'of net income as and for such corporations,' and 'any income tax due' was to be 'assessed and collected in the same manner as if assessed directly against the organizations of whose businesses or properties they have custody and control.' The phraseology of this section was adopted without change in the Revenue Act of 1918, 40 Stat. 1057, 1081, c. 18, § 239. The regulations of the Treasury Department have consistently construed these statutes as applying only to receivers in charge of the entire property or business of a corporation; and in all other cases have required the corporations themselves to report their income. Treas. Regs. 33, arts. 26, 209; Treas. Regs. 45, arts. 424, 622. That construction is clearly correct. The language

of the section contemplates a substitution of the receiver for the corporation; and there can be such substitution only when the receiver is in complete control of the properties and business of the corporation. Moreover, there is no provision for the consolidation of the return of a receiver of part of a corporation's property or business with the return of the corporation itself. It may not be assumed that Congress intended to require the filing of two separate returns for the same year, each covering only a part of the corporate income, without making provision for consolidation so that the tax could be based upon the income as a whole."

The commissioner further asserts that many of the alleged heirs of Thlocco were Indians, that some of them must have been restricted Indians whose incomes were not subject to federal income taxes, and therefore the receiver was not required to make returns and pay taxes on the income that had accumulated in trust in his hands.

▮▮▮ Thlocco was a full-blood Creek Indian and therefore the allotment was restricted. He died about 1900. Upon his death, under section 9, Act May 27, 1908 (35 Stat. 315), the general restrictions were removed. If the allotment passed to a full-blood Indian heir or if Thlocco left surviving issue born after March 4, 1906, qualified restrictions were continued. Holmes v. United States (C. C. A. 10) 53 F.(2d) 960; United States v. Gypsy Oil Co. (C. C. A. 8) 10 F.(2d) 487, 489, 490; Parker v. Richard, 250 U. S. 235, 238, 239, 39 S. Ct. 442, 63 L. Ed. 954; Harris v. Bell, 254 U. S. 103, 41 S. Ct. 49, 65 L. Ed. 159. It is not shown that there were any such heirs or issue claiming under Thlocco. Whether income from lands allotted to a full-blood Creek Indian, after descent to and while in the ownership of such heirs or issue, would be exempt from federal income tax, we do not stop to determine,[3] because we think the status of the persons asserting claims of heirship is beside the question. Under section 2 (b) and section 219 the fiduciary, not the beneficiary, is the taxpayer.

Furthermore, if the matter is to be approached prospectively and in the light of the receiver's knowledge, then it must follow that the receiver, not knowing whom the beneficiary was, could not assert the

---

[3] See Superintendent of Five Civilized Tribes v. Commissioner (decided May 20, 1935) 55 S. Ct. 820, 79 L. Ed. ——; and section 4, Act May 27, 1908, 35 Stat. 313.

income was exempt on account of the beneficiary's status. On the other hand, if the matter is to be approached retrospectively and in the light of the ultimate determination of whom the beneficiaries were, then it must follow that the income belonged to Owens and Brazell, who occupied no exempt status.

We conclude that the income received by the receiver, which arose after Owens and Brazell acquired their interests and after September 8, 1916, was "income accumulated in trust for the benefit of * * * unascertained persons," and that it was the duty of the receiver to return such income for taxation and to pay the tax thereon up to and including the dates hereinafter indicated. Like conclusions have been reached in analogous cases set out in Note 4.

We must assume, in the absence of a contrary showing not here present, that the fiduciary returned and paid the tax thereon. Whitcomb v. Manderville, 90 S. C. 384, 73 S. E. 775, 777.

The income tax laws do not contemplate that income shall be taxed twice, both against the fiduciary and also against the beneficiary. Therefore, when provision is made for taxation against the fiduciary and for payment of the tax by him, the government may not assert a tax against the beneficiary when the money is paid over to him. Haag v. Commissioner, 19 B. T. A. 982, 990.

We do not think it would alter the situation had the fiduciary failed to return and pay the tax, and had the government failed to enforce his liability so to do; but that question is not here presented.

The portions of the fund that accumulated in the hands of the receiver after March 25, 1922, and on final distribution were paid to Owens and Brazell by virtue of their ownership of an undivided six-eighths interest in the allotment, were not funds that had accumulated in the hands of the receiver for the benefit of unascertained persons, because the interest of Owens and Brazell was definitely ascertained and determined on that date. It was, therefore, income to Owens and Brazell when they received it in 1923 and taxable against them in that year. North American Oil Consol. v. Burnet, 286 U. S. 417, 423, 424, 52 S. Ct. 613, 76 L. Ed. 1197.

The orders of the board are reversed and the causes remanded for further proceedings before the board in accordance with this opinion.