577 F.2d 683
 In the Matter of James William VICKERS, Debtor.
The KANSAS STATE BANK AND TRUST COMPANY, Creditor-Appellant,
v.
James William VICKERS, Debtor-Appellee.
 No. 77-2080.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted April 24, 1978.
Decided June 19, 1978.
 
 Gerrit H. Wormhoudt, J. Eric Engstrom and James L. Burgess, Wichita, Kan. (Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., of counsel), for creditor-appellant.
 Thomas C. Triplett, of Martin, Pringle, Schell & Fair, Wichita, Kan., for debtor-appellee.
 Before PICKETT, McWILLIAMS and BARRETT, Circuit Judges.
 PICKETT, Circuit Judge.
 
 
 1
 This litigation arose in a bankruptcy proceeding in the United States District Court for the District of Kansas where James William Vickers had obtained approval of an arrangement concerning his business affairs under Chapter XI of the Bankruptcy Act. At the time, Vickers owed the Kansas State Bank and Trust Company of Wichita, Kansas, approximately $249,000 on two notes. For a number of years, Vickers had been one of about twenty "outside" directors of the bank, and, other than attending board meetings, took no part in its active management. In the course of his business affairs with the bank, Vickers filed periodic financial statements, including one on May 23, 1973, and one on November 9, 1973. The May 23rd statement showed Vickers' net worth to be $3,711,310.79. The November 9th statement reported a net worth of $32,386.15. The bank objected to Vickers' discharge from liability on these notes, alleging that they were within the exceptions of Section 17(a)(2) and (4) of the Bankruptcy Act (11 U.S.C. § 35(a)(2) and (4)).[1] The basis for the objection was that the material in the November 9, 1973 financial statement of Vickers was such as to disclose that the May 23rd report was false and fraudulent and intended to deceive within the meaning of Section 17(a)(2), and was relied upon by the bank in renewing the notes on October 1, 1973. It is also alleged that Vickers' debts to the bank were created by fraud, embezzlement, misappropriation or defalcation while acting in a fiduciary capacity as director of the bank, and therefore were nondischargeable under Section 17(a) (4) of the Act.
 
 
 2
 The bankruptcy court tried the issues, made detailed findings of fact, and concluded that the bank had failed to prove its allegations. The district court, in overruling objections to the judgment of the bankruptcy court, found that the report of the bankruptcy court was not clearly erroneous and specifically adopted the findings and judgment. This appeal followed.
 
 
 3
 The record discloses that Vickers, a member of a "prominent and prestigious" family in Kansas, first established a business relationship with the bank in 1963. In 1968 the loans to Vickers totaled more than $472,000. The periodic financial statements furnished the bank were prepared on bank forms or on those prepared by Vickers. The statements usually included as an asset Vickers' interests in the Vickers Trust, of which he was one of a number of beneficiaries. The parties recognized that the trust was a substantial asset of Vickers, but not one which was available as collateral for loans.
 
 
 4
 Throughout the ten-year period from 1963 to 1973, the numerous loans made to Vickers were secured with real estate mortgages and other security. There was also a personal guarantee by Vickers' former wife. No contention is made that during this period the bank's dealings with Vickers were any different from those of any other customer. The two notes in question originated in 1968 or 1969 and were renewed from time to time. The last renewal was dated October 1, 1973. During this period Vickers became involved in extensive real estate transactions in Colorado Springs, Colorado. Unexpectedly, due to restrictive action of the City of Colorado Springs, the real estate involved could not be developed and Vickers' financial situation became untenable. This situation was discussed with the president of the bank prior to renewal of the notes on July 1 and October 1, 1973. The bank president testified that he observed the May 23rd report when it was filed but did not give it attention when the notes were renewed. There was evidence that the bank was fully aware of Vickers' financial problems prior to these renewals. The November 9th report was prepared after consultation with attorneys and accountants when it became obvious that Vickers would not be able to pay or reduce the bank loans in the immediate future, and in preparation for Chapter XI proceedings. The statement was discussed with and explained in detail to the president of the bank, who did not appear to be concerned and offered to renew the notes when they became due on December 31, 1973. Thereafter, following the recommendation of the president, Vickers was reelected director of the bank for the year 1974.
 
 
 5
 The record is replete with evidence that Vickers' financial reverses were occasioned by unexpected developments in his Colorado real estate ventures, all of which were known to the bank when the notes were renewed in July and October, 1973.
 
 
 6
 The bank's argument is that there are no questions of fact involved and that as a matter of law the undisputed discrepancies in the May 23rd and November 9th financial statements of 1973 disclose (1) that Vickers' dealings with the bank were in violation of his fiduciary obligations to the bank as one of its directors, and (2) the bank, in renewing the July 1 and October 1, 1973 notes, relied upon a materially false statement in writing published with intent to deceive. The bankruptcy court found otherwise as to both issues. It accepted Vickers' explanation of the May 23rd statement, and found that the statement was not intentionally falsified or made to deceive the bank. It was also found that the bank had not relied upon the statement in making the July 1 and November 9, 1973 renewals, and that Vickers was not acting in a fiduciary capacity in borrowing from the bank.[2] On the question of reliance on the May 23rd statement, the bank's president testified:
 
 
 7
 Q. Now, when these notes were reviewed did you make any review of Mr. Vickers' financial statement with him?A. With him?
 
 
 8
 Q. Yes.
 
 
 9
 A. No.
 
 
 10
 Q. Do you say you reviewed his financial statement with somebody else?
 
 A. Our policy is to
 
 11
 Q. I don't ask you your policy. Do you say that you reviewed Mr. Vickers' financial statement with somebody else?
 
 
 12
 A. No.
 
 
 13
 Q. Well, the real fact of the matter is that in 1973 you weren't reviewing his financial statement, you were really paying rather slight attention to it, weren't you? Is that true or false?
 
 
 14
 A. Mr. Vickers had been a long-time customer.
 
 
 15
 Q. Would you answer the question, please, which I think you can answer yes or no.
 
 
 16
 A. Can you restate it, please?
 
 
 17
 Q. My question is that when these renewals were made in 1973, you were not reviewing his financial statement, other than perhaps in a cursory manner, and you were really giving it slight attention.
 
 
 18
 A. I did not review it each time the loan was remade, no.
 
 
 19
 Q. Is my question correct, that you were giving it slight attention or none at all when those renewals were placed?
 
 
 20
 A. I gave it attention when it was filed, but probably not after that, yes.
 
 
 21
 Vickers explained the reasons for the differences in the two statements. They were obviously made under different circumstances and for different purposes. The November 9th statement was made with the advice of attorneys and accountants. It anticipated reorganization under Chapter XI Proceedings. The bankruptcy court, in accepting Vickers' explanation of the statements, stated in its findings:
 
 
 22
 When the moratorium was imposed by the City of Colorado Springs, Vickers was trying to dispose of his investment there known as Academy Lands, and hoped to realize $1,000,000 net to be used for debt liquidation. This was fully discussed by Vickers with the then-president of the bank, Mr. Kenneth Johnson, prior to renewal of the notes in July of 1973. When the notes were renewed in July of 1973, the bank, through its president, was aware of Vickers' financial problems.
 
 
 23
 The assets and liabilities referred to in the two statements are extensive and involve mortgages, contingent liabilities, pledges, secured and unsecured loans, partnerships, trust property, sole proprietorships and contracts of sale.
 
 
 24
 The November 1973 statement contains approximately $1,200,000 more liabilities than appear in the May 1973 statement. Vickers accounts for this by showing only the net value of certain proprietorship and partnership interests; one such was the Circle Drive or Valli High Shopping Center, a shopping center in Colorado Springs, Colorado. In the May statement, the mortgage indebtedness and the balance on the land purchase contract totaling $1,020,000 were subtracted from the gross value of the property. In the November statement, the gross value of the property was shown and the mortgage and land purchase balance were shown in the liabilities. There are other instances of this nature appearing in the two statements. There were debts incurred and loans paid between the dates of the two statements.
 
 
 25
 Vickers testimony accounts for all but a difference of $40,000 in the two statements, by his testimony from the witness stand without benefit of all his records. Each statement lists assets and liabilities between $6,000,000 and $7,000,000.
 
 
 26
 Whether liabilities of a bankrupt are within the exceptions of Section 17(a) (2) and (4) and nondischargeable are questions of fact to be determined by the bankruptcy court. The only issue presented on this appeal is whether there was sufficient evidence to sustain the court's findings and that they were not clearly erroneous.
 
 
 27
 One of the primary purposes of the Bankruptcy Act is the rehabilitation of an honest debtor by discharging his debts to afford him a fresh start in his economic life. Exceptions to this general policy should be strictly construed against an objecting creditor and in favor of the debtor's right of discharge. 9 Am.Jur.2d Bankruptcy § 676; Gleason v. Thaw, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915); Wukelic v. United States, 544 F.2d 285 (6th Cir. 1976); Bostwick v. United States, 521 F.2d 741 (8th Cir. 1975); In Re Dolnick, 374 F.Supp. 84 (N.D.Ill.1974).
 
 
 28
 Rule 810, Rules of Bankruptcy Procedure (11 U.S.C. Rule 810), provides:
 
 
 29
 Upon an appeal the district court may affirm, modify, or reverse a referee's judgment or order, or remand with instructions for further proceedings. The court shall accept the referee's findings of fact unless they are clearly erroneous, and shall give due regard to the opportunity of the referee to judge of the credibility of the witnesses.
 
 
 30
 See also In Re Romero, 535 F.2d 618 (10th Cir. 1976); In Re Barraco and Company, 478 F.2d 517 (10th Cir. 1973); Wolfe v. Tri-State Insurance Company, 407 F.2d 16 (10th Cir. 1969); In Re Perdue Housing Industries, Inc., 437 F.Supp. 36 (W.D.Okl.1977); In Re Williamson, 431 F.Supp. 1023 (W.D.Okl.1976). This court has also said that the findings of the bankruptcy court should be overturned only "for the most cogent reasons appearing in the record." Wolfe v. Tri-State Insurance Company, supra; Federal Credit Union v. Niemeier, 227 F.2d 287 (10th Cir. 1955).
 
 
 31
 The bank, in urging that the two notes of Vickers were nondischargeable under Section 17(a)(2) and (4), argues that the November statement shows as a matter of law that the May 23rd statement was false and fraudulent and intended to deceive the bank. To be false or fraudulent within the meaning of the statute the statement must be more than erroneous. It must have been false and intended to deceive, and relied upon by the creditor. In Re Taylor, 514 F.2d 1370 (9th Cir. 1975); Wolfe v. Tri-State Insurance Company, supra; American National Bank of Denver v. Rainguet, 323 F.2d 881 (10th Cir. 1963). The bankruptcy court found that Vickers' explanation of the variances in the two statements as analyzed by the court was plausible. There was a total lack of any evidence of intent to deceive, and the evidence indicates that the bank did not rely upon the May 23rd statement when the notes were renewed. The record discloses that the statement had little if any influence upon the bank's decision to renew.
 
 
 32
 Debts that are excepted from discharge under Section 17(a)(4) are those "created" by fraud, embezzlement, misappropriation or defalcation while acting as an officer or in a fiduciary capacity. In Kansas, directors of a corporation occupy a position of trust and are strictly accountable in their dealings with the corporation. Delano v. Kitch, 542 F.2d 550 (10th Cir. 1976). This does not, however, prevent a director of a bank from borrowing money from the bank if the transaction is honest and in good faith. It is quite evident from the record that Vickers was a long-time customer of the bank and that his selection as a director was to add prestige to it. He had no official bank duties, was in possession of no money or property of the bank, and could not make loans. Throughout his association with the bank his business had been quite extensive and profitable. The ten-percent interest on the two notes in question was approximately $25,000 annually payable quarterly. There was substantial collateral security for the loans which at the time of the bankruptcy was not adequate to cover the amount due. These loans were made long before the May 23rd statement, and there is no evidence that the dealings then between the bank and Vickers were any different than those with any other customer, or that his position as a director was considered when the loans were approved.
 
 
 33
 Generally the courts have held that the "fiduciary capacity" as used in Section 17(a)(4) refers to money or property entrusted by one to another. As this court said in In Re Romero, supra, at 621:"Fiduciary capacity" as used in § 17(a)(4), supra, has been held to connote the idea of trust or confidence, which relationship arises whenever one's property is placed in the custody of another. . . .
 
 
 34
 Davis v. Aetna Acceptance Co., 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); Hamby v. St. Paul Mercury Indemnity Company, 217 F.2d 78 (4th Cir. 1954); Commissioner of Internal Revenue v. Owens, 78 F.2d 768 (10th Cir. 1935). So far as the notes were concerned, the relationship between Vickers and the bank was no more than that of debtor and creditor, and therefore dischargeable in bankruptcy. It is also significant that when Congress, by a 1960 amendment, extended the Section 17(a)(2) exceptions to include the obtaining of an extension or renewal of credit by a false statement in writing, it did not include the same provision in Section 17(a)(4). We are satisfied from a review of the entire record that the bankruptcy court's findings were not clearly erroneous.
 
 
 35
 AFFIRMED.
 
 
 
 [1]
 Section 17(a) of the Bankruptcy Act reads in part as follows:
 A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . (2) are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive, or for willful and malicious conversion of the property of another . . . (or) (4) were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity . . . .
 
 
 [2]
 Specifically, the court found:
 "The bank did not make the loans or renew them in reliance upon a false financial statement by Vickers. The loans were made in reliance upon a combination of factors including security and the fact the borrower, Vickers, was a member of an honorable and prestigious family in Wichita, as well as a businessman with contacts felt to be desirable for directors of the bank.
 "From the evidence, the court is unable to find the May 23, 1973 financial statement by Vickers was intentionally false or made with intent to deceive the bank and relied upon by the bank in making the loans.
 "Vickers was not acting in a fiduciary capacity as a borrower from the bank and the indebtedness evidenced by the notes in question was not created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity."