**In re Bruce J. ARBANEY, Debtor.**

**BTE Concrete Formwork, LLC, Plaintiff,**

**v.**

**Bruce J. Arbaney, Defendant.**

**Bankruptcy No. 05–11401 HRT.**
**Adversary No. 05–1366 HRT.**

United States Bankruptcy Court,
D. Colorado.

May 10, 2006.

Matthew D. Skeen, Skeen & Skeen, P.C., for Plaintiff.

F. Kelly Smith, Law Offices of F. Kelly Smith, for Defendant.

### ORDER DENYING OBJECTION TO DISCHARGE

HOWARD R. TALLMAN, Bankruptcy Judge.

This case comes before the Court for trial on Plaintiff's *Complaint Objecting to Discharge of Debtor.*

This matter was tried to the Court on February 28, 2006. The Court has consid-

ered the evidence and arguments presented at trial along with the pleadings filed in the case.

## I.  FACTS

### A.  Stipulated and Uncontested Facts

The Court adopts the following Stipulated and Uncontested Facts contained in the parties' *Joint Pretrial Statement:*

1.  The Court has jurisdiction to hear the claims raised in the Plaintiff's Complaint.

2.  The Plaintiff is the holder of an unsecured claim against the Defendant.

3.  On October 1, 2004, the Defendant signed a warranty deed transferring to his wife, Rue Balcomb Arbaney, all of his interest in the real property know as 0410 County Road 137, Glenwood Springs, Colorado 81601 [the "Transfer"].

4.  In May of 1994, the Defendant and Rue Balcomb Arbaney purchased 42.110 acres of land and a single family residence in Garfield County, Colorado, [the "Real Estate"] for approximately $100,000.00.

5.  On May 25, 1999, the Defendant and his wife obtained a construction loan from Vectra Bank in the amount of $412,000, and used the money to build what is now their residence on part of the 42 acres.

6.  On February 20, 2003, Main Mechanical, Inc. was incorporated by the Debtor's father-in-law, Scott Balcomb, acting as an attorney for the Debtor.  Main Mechanical, Inc. engaged in an HVAC and plumbing business.

7.  On July 23, 2004, the Debtor and his wife obtained a loan from Alpine Bank in the amount of $238,026.00 [the "2004 Alpine Loan"].  The proceeds of this loan from Alpine Bank were used to retire four existing loans from Alpine Bank, for which the Debtor and his wife, Rue Balcomb Arbaney were each liable, in the cumulative amount of $131,917.31.  Main Mechanical, Inc. was liable, along with the Debtor and his wife, on only one of the loans, # 864011487, in the amount of $18,750.74.

8.  On October 27, 2004, the Internal Revenue Service received $62,838.44 from the loan proceeds of the 2004 Alpine Loan, which was applied to withholding tax liability for Main Mechanical, Inc.

9.  Mr. Balcomb devised a plan for the Debtor and his wife to grant two conservation easements covering the 42.11 acres of land on which they lived and had their rental house to the Aspen Valley Land Trust.  By doing this, the Debtor and Ms. Arbaney would create tax credits, which could then be sold for a discount.  The sale of the tax credits would provide the cash to enable Rue Balcomb to pay back the 2004 Alpine Loan.

10.  The Debtor filed his voluntary chapter 7 bankruptcy case on January 27, 2005.

11.  Immediately prior to and subsequent to the Transfer of the Debtor's half interest in the 42.11 acres to his wife, the Debtor and his wife received rental income from a house located on the property of $800 per month.

12.  Prior to and subsequent to the conveyance of the Debtor's half interest in the 42.11 acres to his wife, the Debtor continued to use one of the houses on that property as his primary residence.

13. The Debtor and his wife, Rue Balcomb Arbaney were jointly liable on Alpine Bank loans numbered 0160190901, 0151251001, 864011487, 0151075301 prior to the payoff of these loans through the new borrowing from Alpine Bank on or about July 23, 2004.

14. The Debtor has never received a release from his obligations on notes and deeds of trust which encumber the 42.11 acres including his obligation to Washington Mutual, Vectra Bank, and the indebtedness created by the 2004 Alpine Loan.

15. On August 18, 2004, Rue Balcomb Arbaney and the Debtor signed and delivered a Deed of Conservation Easement to Aspen Valley Land Trust covering twenty acres of the 42.11 acres that they owned.

### B. Additional Facts Found by the Court

In addition to those stipulated facts, from the evidence presented at trial, the Court makes the following factual findings:

1. For the purposes of this proceeding only, the Court finds that, prior to July of 2004, the value of the Real Estate was $875,000.00.[1]

2. As a result of the August 18, 2004, conveyance of a conservation easement on approximately half of the Real Estate, the value of the Real Estate declined by $210,500.00.[2]

**1.** The best evidence of the Real Estate's fair market value offered to the Court was this estimate of value testified to by Scott Balcomb during Plaintiff's direct examination. The Court found Mr. Balcomb's testimony to be credible and candid. Mr. Balcomb is an attorney who has had considerable involvement in real estate transactions in the vicinity where the Real Estate is located. Under the circumstances, the Court finds Mr. Balcomb to be competent to testify as to the value of the Real Estate for the purposes of this proceeding.

Plaintiff also entered into evidence a document entitled *Appraisal Report on Arbaney/Balcomb Conservation Easement,* dated June 28, 2004, prepared by Pamela M. Sant, a certified general appraiser employed by Appraisal Associates of Colorado, Inc. [the "Easement Appraisal"]. The purpose of the Easement Appraisal was to estimate the decline in the Real Estate's market value resulting from conveyance of a conservation easement on half of the Real Estate. According to the information contained in that appraisal, existing improvements on the Real Estate are disregarded in making a determination of the effect granting a conservation easement will have on the value of the property. The Real Estate contains a newer home built by the Debtor and his wife along with a smaller rental cabin. As the appraisal notes, those improvements are elements of the market value of the Real Estate. But, because the purpose of that appraisal was not to determine fair market value, but to determine the change in the value of the Real Estate, caused by granting a conservation easement, the improvements on the property were disregarded. Consequently, the Court concludes that the Easement Appraisal does not contain appropriate information for the Court to determine the Real Estate's fair market value.

The Plaintiff urges the Court to assume that the Real Estate value is significantly more than the $842,000.00 land value that is contained in the Easement Appraisal because of the value of improvements and water rights that are not part of that appraisal. Plaintiff argues that the fair market value may be as high as $1.1 million to $1.2 million. But the Plaintiff has given the Court no real guidance as to how it might calculate an alternative value. To choose another value based on the evidence that is before the Court would go beyond reasonable inference from the evidence and would enter the realm of speculation. The Court does view the valuation evidence with a measure of caution, but no real alternative to Mr. Balcomb's testimony appears in the record.

**2.** This is based on the Easement Appraisal referenced in the previous footnote. As with Mr. Balcomb's value testimony, the Court views the this figure for the diminishment of value resulting from conveyance of a conservation easement with a measure of caution.

The Court heard testimony that a conservation easement on the second half of the Real Estate was conveyed in January of 2005. However, there is no evidence in the record from which the Court may determine how much further the value of the Real Estate was reduced as a result of that second conservation easement conveyance.

3. Prior to July 23, 2004, the mortgage liens against the Real Estate, in favor of Vectra Bank and Washington Mutual, totaled approximately $466,000.00.

4. Prior to July 23, 2004, the joint equity of the Debtor and Mrs. Arbaney was $409,000.00. The Debtor's share of equity in the Real Estate prior to July 23, 2004, was $204,500.00.

5. The 2004 Alpine Loan was secured by a deed of trust on the Real Estate.

6. At the time that proceeds from the 2004 Alpine Loan were disbursed, four preexisting Alpine bank loans, in the total amount of $131,917.21, were paid off from those loan proceeds. Mrs. Arbaney was a co-obligor on all four notes. Proceeds from all of those prior Alpine Bank obligations were used in the operation of Main Mechanical.

7. In December of 2004, approximately $125,454.00 was credited towards repayment of the July, 2004, Alpine bank loan of $238,000.00. That payment was derived from the sale of an income tax credit generated by the August 18, 2004, donation of a conservation easement on approximately one half of the Real Estate to Aspen Valley Land Trust.

8. In January of 2005, Rue Balcomb Arbaney donated a conservation easement on the remaining one-half of the Real Estate. The income tax credit generated by that donation was subsequently purchased by Alpine Bank. There was no testimony as to the value of the easement; the amount of available tax credit based on the donation; or the amount realized from the sale of this tax credit.

## C. General Background

This case arises out of the failure of Debtor's business, Main Mechanical. From the outset, the business was not successful. Eventually, Debtor entered into discussions with Terry Ostrom ["Ostrom"], Plaintiff's general manager and part owner, concerning a possible merger of the two businesses. Thereafter, the Plaintiff made a series of loans to the Main Mechanical, personally guaranteed by the Debtor, to keep Main Mechanical afloat while Plaintiff reviewed its operations and its records.

Ostrom testified that, prior to making those advances, the Debtor had told him that, if all else failed, the loans could be repaid by the creation of a conservation

---

But, it is the best evidence the Court has before it with respect to the effect of granting the conservation easements on the value of the Real Estate. In many ways, it is better evidence than the Balcomb value testimony because it is an appraisal report prepared by a professional appraiser. In this context, the Court is using the Easement Appraisal for its intended purpose. Above, the Court rejects the Plaintiff's suggested use of the Easement Appraisal to derive an estimate of the Real Estate's market value. It does so, in part, because that would have been a use that fell outside the intended purpose of the Easement Appraisal. In addition, the record simply does not contain evidence of value with respect to improvements and water rights that would permit the Court to derive an overall market value figure without an impermissible amount of guesswork on the Court's part.

easement on the Real Estate and the sale of tax credits that creation of the easement would generate.

During that due diligence period, Plaintiff took over the bookkeeping responsibilities for Main Mechanical because, at that point, Main Mechanical did not employ a bookkeeper. The merger discussions ended and Plaintiff made demand on the Debtor for repayment of the loans after Mr. Ostrom learned of substantial tax liabilities and lease arrearages, which Debtor had not revealed to him. The loans were not repaid.

After Main Mechanical ceased doing business, the Debtor, with the assistance of his father-in-law Scott Balcomb, a Glenwood Springs attorney, devised a plan to try and repay his remaining business creditors as well as a substantial outstanding withholding tax liability. The plan involved trying to liquidate remaining business equipment and accounts receivable and obtaining a loan to make payments to creditors. The loan was to be paid off through the sale of conservation income tax credits generated as a result of donating conservation easements on the Real Estate owned by the Debtor and his wife. The plan also involved transfer of the Real Estate from joint ownership to the sole ownership of Debtor's wife.

The accounts receivable and other business assets proved to have little or no value and the loan proceeds were insufficient to pay all debts of the business. A number of creditors negotiated reduced cash payments to settle their debts. Other creditors declined to entertain such settlements and brought suit against the Debtor. Plaintiff and the Debtor did conduct negotiations with respect to Plaintiff's debt, but no settlement was ever executed. Under mounting pressure of multiple lawsuits, the Debtor ultimately filed his bankruptcy case.

Plaintiff's Complaint asserts two grounds to support the denial of Debtor's discharge. Plaintiff claims that the Debtor transferred his interest in the Real Estate to his wife with actual intent to hinder, delay or defraud his creditors so that he is not eligible for discharge under 11 U.S.C. § 727(a)(2)(A). In addition, Plaintiff would have the Court deny Debtor his discharge under 11 U.S.C. § 727(a)(4)(A) for making a false oath in connection with his bankruptcy schedules, which omitted some property interests, transactions, and creditors.

## II. DISCUSSION

### A. Credibility of Debtor's Testimony

As an initial matter, during the Plaintiff's closing statement, counsel questioned Debtor's candor and credibility. According to Plaintiff's counsel, the Debtor could not genuinely be as dumb as he presented himself. The Court agrees. The Debtor testified to his limited education and lack of financial management responsibilities in his employment history. Those matters and the failure of his business do reflect some lack of financial sophistication. Notwithstanding all of that, the Court did not find the Debtor's professed lack of knowledge of his business affairs to be credible.

The Debtor continually testified to a complete lack of knowledge or understanding with respect to his financial troubles or the efforts of his wife and father-in-law to bail him out of those difficulties. Moreover, he disclaimed any knowledge of various documents which bore his signature. If his testimony were to be believed, the Debtor's lack of curiosity and engagement with respect to the details, or even the broadest outlines, of his financial well-being and future prospects is truly breathtaking. The Court does not buy it.

In part, the Court finds the Debtor not to be credible on the basis of the general inconsistency of his testimony and the Court's opportunity to observe his demeanor on the witness stand. In addition to that, the Debtor's testimony is directly contradicted by other evidence. The Debtor had denied any knowledge whatsoever of conservation easement tax credits. But, Ostrom testified that part of his discussions with the Debtor concerned the repayment of Plaintiff's loans by means of selling conservation easement tax credits if necessary. Ostrom further testified that the Debtor provided him with a web site address where he could learn more about conservation easements because Ostrom was interested in looking into that process for his own purposes. During the direct examination of Scott Balcomb, he testified that he had represented members of the Debtor's family in transactions involving the creation and sale of income tax credits associated with conservation easements during the years of 2004 and 2005. The Debtor's testimony that he knew nothing about conservation easement tax credits is not believable in light of other evidence.

Because the Court does not deem the Debtor's testimony to be credible, wherever that testimony is contradicted by other evidence in the record, the Debtor's testimony has been disregarded.

### B.  11 U.S.C. § 727(a)(2)(A)

Section 727(a)(2)(A) provides that

The court shall grant the debtor a discharge, unless—

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be ·

transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition. . . .

11 U.S.C. § 727(a)(2)(A) (2004).

■ This provision as well as the other provisions of the Bankruptcy Code which deny or limit a debtor's discharge of debts are construed strictly. *Gleason v. Thaw,* 236 U.S. 558, 561–62, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915) ("In view of the well-known purposes of the bankrupt law, exceptions to the operation· of a discharge thereunder should be confined to those plainly expressed."); *Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1292 (10th Cir.1997); *Dalton v. I.R.S.,* 77 F.3d 1297, 1301 (10th Cir.1996); *Kansas State Bank and Trust Co. v. Vickers (In re Vickers),* 577 F.2d 683, 686–87 (10th Cir.1978).

It is undisputed that the Debtor did transfer his one-half equity interest in the Real Estate to his wife within one year before filing his bankruptcy case. The matter that is in dispute is whether the Debtor did so with the intent to hinder, delay or defraud his creditors.

### 1)  Proof of Fraudulent Intent

■ "At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection." Fed. R. Bankr. P. 4005. Fraudulent intent is a matter of a debtor's state of mind. Proof of a fraudulent state of mind is most commonly approached indirectly through the badges of fraud.

Various courts have identified a number of circumstances evidencing actual intent to defraud under section 727(a)(2)(A). They include: 1) the lack or inadequacy of consideration; 2) the family, friendship or close associate relationship between the parties; 3) the retention of possession, benefit or use of

the property in question; 4) the financial condition of the party sought to be charged both before and after the transaction in question; 5) the existence of a pattern or series of transactions after the onset of financial difficulties, or pendency or threat of suits by creditors; and 6) the general chronology of the events and transactions under inquiry. *Aweida v. Cooper (In re Cooper)*, 150 B.R. 462, 465 (D.Colo.1993) (citing. *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir.1989)).

This list is by no means exhaustive. In *In re Calder*, the tenth circuit was persuaded of a debtor's fraudulent intent by his experience as a bankruptcy lawyer, by the number of omissions (four), and by partnership records which failed to show absolute and irrevocable divestment of the debtor's partnership interest. 907 F.2d at 956.

*Aweida*, 150 B.R. at 465 n. 1.

■ A sufficient showing of the presence of badges of fraud raises a presumption that a debtor's actions were done with fraudulent intent. After the presumption of fraud has arisen, it then falls to the defendant to demonstrate the absence of a fraudulent motive for his actions. *Schilling v. Heavrin (In re Triple S Restaurants, Inc.)*, 422 F.3d 405, 414 (6th Cir. 2005); *Village of San Jose v. McWilliams*, 284 F.3d 785, 791 (7th Cir.2002); *Kelly v. Armstrong*, 141 F.3d 799, 802–803 (8th Cir.1998) (§ 548 fraudulent transfer action); *Mather v. Clancy (In re Honey Creek Entertainment, Inc.)*, 246 B.R. 671,

685 (Bankr.E.D.Okla.2000) (§ 548 fraudulent transfer action) *rev'd on other grounds* 37 Fed.Appx. 442, 443, 2002 WL 1265630, *1 (10th Cir.2002); *Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116, 121 (M.D.Fla.1991).[3]

### *2) Operation of the Presumption*

■ It is frequently said that the burden of proof shifts to the defendant upon a sufficient showing of the badges of fraud, but to say that the burden of proof shifts is a misnomer. The burden of proof always rests with the Plaintiff. The operation of the presumption is clarified by the Federal Rules of Evidence:

In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

FED.R.EVID. 301.

### *3) The "Balcomb Plan"*

■ This case is unusual because the Transfer was just one of a number of events that took place between July of 2004 and January of 2005:

1. A $238,026.00 loan was taken from Alpine Bank on July 23, 2004. Those loan proceeds were used to

**3.** In *BFP v. Resolution Trust Corp.*, the Supreme Court explained

The modern law of fraudulent transfers had its origin in the Statute of 13 Elizabeth, which invalidated "covinous and fraudulent" transfers designed "to delay, hinder or defraud creditors and others." 13 Eliz., ch. 5 (1570). English courts soon developed the doctrine of "badges of fraud":

proof by a creditor of certain objective facts (for example, a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration) would raise a rebuttable presumption of actual fraudulent intent. 511 U.S. 531, 540–41, 114 S.Ct. 1757, 1763, 128 L.Ed.2d 556 (1994).

pay $131,917.21 of existing Alpine Bank debt; $62,838.44 to the IRS; and the remainder to those Main Mechanical trade creditors who were willing to settle their claims.

2. A conservation easement on one-half of the Real Estate was conveyed to the Aspen Valley Land Trust on August 18, 2004. The conveyance of this conservation easement entitled the Debtor and Mrs. Arbaney to an income tax credit worth $144,200.00.

3. The Transfer of the Real Estate from the Debtor to Mrs. Arbaney took place on October 1, 2004.

4. The tax credit generated by the August 18, 2004, conveyance of the conservation easement was sold on December 31, 2004, for approximately $125,454.00 and the proceeds of that sale were paid directly to Alpine Bank to reduce the balance of the 2004 Alpine Loan.

5. In January of 2005 a new conservation easement on the remaining half of the Real Estate was conveyed. Shortly thereafter, Alpine Bank purchased the tax credit generated by that second conservation easement.

All of these events had a common object. They were all part of a plan, devised by Scott Balcomb, to raise funds to be used for the payment of business debts generated because of the failure of Main Mechanical [the "Balcomb Plan"]. Because the ultimate goal of this analysis is to make a determination of whether or not the Debtor intended to hinder, delay or defraud his creditors when he transferred his interest in the Real Estate to Mrs. Arbaney, the Court finds it most appropriate to treat all of the elements of the Balcomb Plan as part and parcel of the Transfer itself. To view the conveyance of title that occurred on October 1, 2004, in isolation from those related actions would not present an accurate portrayal of the events.

*4) Plaintiff's Evidence Raises a Presumption of Fraudulent Intent*

Some of the badges of fraud are clearly present in this case. The Transfer to the Debtor's spouse was certainly to a close family member; the Debtor's possession and use of the Real Estate did not change after the Transfer; and the Debtor was in severe financial straits at the time of the Transfer. However, inadequacy of consideration was not conclusively shown by the Plaintiff. Plaintiff argues that it does not need to provide such proof. It argues that the above factors raise the presumption of fraud so that the burden is upon the Debtor to show adequacy of consideration.

■ Adequacy of consideration is central to any discussion of a transfer of assets in derogation of the rights of a transferor's creditors. *See, e.g., Bank of Chester County v. Cohen (In re Cohen),* 142 B.R. 720, 729 (Bankr.E.D.Pa.1992) (" 'Badges' which we consider very significant are the 'adequacy of consideration' and the effect of the transfer on the transferor's financial condition."); *Douglas County Bank v. Fine (In re Fine),* 89 B.R. 167, 175 (Bankr.D.Kan.1988) ("[I]f the family members, friends, or close associates actually paid fair and adequate consideration, then the mere fact of the relationship alone does not carry much weight in finding fraudulent intent."). But, where other significant indicia of fraud are present, it may not be necessary to show inadequate consideration to give rise to a presumption of fraud. *Schilling v. Heavrin (In re Triple S Restaurants, Inc.),* 422 F.3d 405, 415 (6th Cir.2005) ("[W]e hold that the burden of proof may shift even where consideration has not been shown to be inadequate.").

Given the endless factual variations in cases involving claims of fraudulent transfer, it is impossible to formulate a precise rule to determine when the presumption arises and the burden shifts to the defendant to provide evidence to meet the presumption. In this case, the presence of a transfer to a spouse where possession of the property remains unchanged at a time of financial difficulty is sufficient to cause the presumption of fraud to arise and to place the burden upon the Debtor to adequately demonstrate the non-fraudulent purposes of the transaction. The Debtor has met that burden.

### 5) Debtor's Rebuttal to the Presumption of Fraudulent Intent

#### a) Adequacy of Consideration

The question of adequacy of consideration is difficult in this case because the linchpin of any determination the Court might make regarding consideration for the Transfer is the question of the value of the Real Estate. The Court has made a finding that, at the outset of the Balcomb Plan, the Real Estate had a value of $875,000.00. This is based on testimony elicited from Scott Balcomb during the Plaintiff's direct examination. More reliable evidence of value could have been presented. But, it wasn't and the Court has found sufficient indicia of reliability to accept Balcomb's value figure for the purposes of this proceeding. The Court accepts and will use the $875,000.00 value figure in its analysis, but it remains mindful that the valuation evidence in the record may not be entitled to the same weight that the Court would have likely given to a market value appraisal produced by a professional appraiser.

In looking at the adequacy of consideration, the Court will disregard the consideration recited in the settlement statement that was executed at the time of the transfer of title that took place on October 1, 2004. It will do so for two reasons. First of all, the Court views the actual transfer of title as only one part of the larger transaction and to focus on what did or did not change hands on October 1 would present a misleading picture of the events. More importantly, the Court's focus is more upon the effect that the transaction had on the assets of the Debtor's estate instead of what changed hands between the Debtor and Mrs. Arbaney. *See First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1344–45 (9th Cir.1986) ("The language of section 727(a)(2)(A) demonstrates that Congress intended to deny discharge to debtors who take actions designed to keep their assets from their creditors either by hiding the assets until after they obtain their discharge in bankruptcy or by destroying them.") (citing D. COWANS, COWANS BANKRUPTCY LAW AND PRACTICE § 5.20 (interim ed.1983)).

No consideration ever actually came into the Debtor's hands. What the Debtor received by way of the Balcomb Plan was payment of debts, incurred in the operation of Main Mechanical, in the amount of $238,000.00. At the outset of the Balcomb Plan, the Debtor's half of the equity in the Real Estate amounted to $204,500.00. Therefore, his creditors received $33,500.00 more by way of the Balcomb Plan than the Debtor's equity in the property. If the Debtor had voluntarily liquidated the Real Estate and paid over his portion of the equity to creditors after paying the costs of such a sale, the creditors would have gotten much less.

Perhaps, a more telling analysis is to examine what creditors realized from the funds generated by the Balcomb Plan compared to how they would have fared if the Real Estate had been taken into the Debt-

or's chapter 7 bankruptcy as it existed prior to July of 2004.[4]

Using powers available under § 363(h), a chapter 7 trustee would have sold the jointly owned property. The Court will assume that he received sale proceeds of $875,000.00. Out of that, he would have paid $466,000.00 in mortgage debt. He would have paid the costs of sale; the Court will conservatively assume 6% for costs such as a realtor's fee, or $52,500.00. The remaining $356,500.00 would have been divided in half and $178,250.00 would have been paid over to Mrs. Arbaney. The trustee would incur legal and other costs in administering the estate and the Court will assume trustee expenses of $5,000.00.[5] Trustee compensation, calculated under § 326(a), would amount to $26,002.50.[6] Finally, the Debtor would be entitled to half of the $45,000.00 homestead exemption—$22,500.00. That would result in $124,747.50 available to be distributed to creditors from the Real Estate asset in a chapter 7 case. Under the Balcomb Plan, $238,000.00 was distributed to creditors.

Even if the trustee received sale proceeds as high as $1.15 million,[7] after paying the mortgages, the $69,000.00 sale costs, Mrs. Arbaney's portion of $307,500.00, legal costs, $30,375.00 of trustee compensation and the homestead ex-

emption, the estate would have distributed about $249,625.00 to creditors—about 5% greater than under the Balcomb Plan. The following is a graphical calculation of the above two scenarios:

**Scenario # 1**

| | |
|---|---|
| Sale Price | $ 875,000.00 |
| Less 6% Sale Costs | -$ 52,500.00 |
| Less Mortgages | -$ 466,000.00 |
| Result | $ 356,500.00 |
| Less Co-owner Share | -$ 178,250.00 |
| Less Expenses | -$ 5,000.00 |
| Less Trustee Comp. | -$ 26,002.50 |
| Less Homestead | -$ 22,500.00 |
| **Amt. to Creditors** | $ 124,747.50 |

**Scenario # 2**

| | |
|---|---|
| Sale Price | $1,150,000.00 |
| Less 6% Sale Costs | -$ 69,000.00 |
| Less Mortgages | -$ 466,000.00 |
| Result | $ 615,000.00 |
| Less Co-owner Share | -$ 307,500.00 |
| Less Expenses | -$ 5,000.00 |
| Less Trustee Comp. | -$ 30,375.00 |
| Less Homestead | -$ 22,500.00 |
| **Amt. to Creditors** | $ 249,625.00 |

The Court has compared the gross amount of funds made available to creditors through the Balcomb Plan as opposed to the gross amount that would have been distributed to creditors if the Real Estate had been sold in a chapter 7 bankruptcy proceeding. There are other differences. Under the Balcomb Plan, the IRS and

**4.** Prior to July, 2004, the Real Estate was not encumbered by the lien granted in connection with the 2004 Alpine Loan. Nor had the conservation easements been granted and become encumbrances upon the Real Estate.

**5.** An expense figure of $5,000.00 is conservative. Having heard the parties' testimony at hearing, the Court cannot assume the trustee could sell the Real Estate without an objection or at least some resistance from the co-owner.

**6.** The Court has not used the co-owner share in calculating a hypothetical trustee's fee under § 326(a) even though that subsection ap-

pears to be worded broadly enough to include that amount in the calculation. *See, e.g., In re Rybka,* 339 B.R. 464, 471 (Bankr.N.D.Ill. 2006) (The bankruptcy court overruled an objection to the trustee's fee application, which included the co-owner share of § 363(h) sale proceeds in the amount upon which the trustee's fee was calculated.).

**7.** The Court has used this figure for the sake of comparison only. Plaintiff has argued that the Real Estate should be valued between $1.1 million and $1.2 million. The Court has not adopted the Plaintiff's estimate of value because, as previously noted, that estimate is too speculative.

Alpine Bank were paid in full; some creditors compromised their claims and received reduced payments; and some creditors did not compromise their claims and received nothing. In a chapter 7 proceeding, the IRS would still have been fully paid, but the other creditor claims, including Alpine Bank's, would have received pro-rata distributions. In that sense, the Balcomb Plan resulted in a different distribution scheme than would have resulted from a chapter 7 distribution. But that fact does not call into question the good faith of the Balcomb Plan which, in the end, resulted in substantial funds being made available to creditors.[8]

■ The Court will make one final observation regarding the evidence of the Real Estate value that it has relied on. As the Court previously noted, objections to discharge are strictly construed. All doubts must be resolved in favor of the Debtor. *See, e.g., XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1452 (6th Cir.1994). In terms of fair market value, the Court suspects that the estimate of $875,000.00 may be somewhat low. At the same time, the Plaintiff's argument that it could be as high as $1.1 million to $1.2 million is probably exaggerated. The Court has expressed its concerns regarding the Debtor's credibility, but the valuation evidence it has used did not come from the Debtor,

but from Scott Balcomb, who the Court did find to be credible.

Moreover, discussions of fair market value in this context may well be academic. This Debtor was being sued by multiple creditors. Even if the Debtor had been determined to pay creditors by liquidating his interest in the Real Estate through an outright sale, he may not have had the time to market the property in such a way that it would be likely to sell for fair market value. The value of $875,000.00 may be short of what a fair market value appraisal of the Real Estate would have shown. But, the Court believes it is at least as high as the Debtor and Mrs. Arbaney could have expected to receive for the Real Estate under forced-sale conditions.

The Balcomb Plan did not have the effect of putting property out of reach of creditors. To the contrary, it allowed the Debtor to make more money available to creditors than would have been available to them if he had either sold the Real Estate and paid his equity over to creditors or if such property had been liquidated in his chapter 7 bankruptcy proceeding.[9] In this context the Court's focus is on whether or not the Debtor's estate was depleted due to the Debtor's actions. Indeed, it was not; if anything, it was enhanced. Accordingly, the Court finds that

---

8. Under certain circumstances, the Bankruptcy Code provides for recovery of payments made to creditors shortly before the filing of a bankruptcy petition. The trustee may recover and redistribute payments that meet the definition of a preferential transfer under the Code. But such payments are typically perfectly legitimate, above board, payments made on pre-existing obligations. It is solely by operation of the Code that such payments may become recoverable preferences.

9. The fact that the creditor body as a whole received more through the operation of the

Balcomb Plan than it would have otherwise is likely to be little comfort to the Plaintiff in this action. The Court is mindful that the Plaintiff received nothing out of that process. The Court heard evidence of the settlement negotiations between the Plaintiff and Defendant; and the fact that those negotiations did not ultimately result in an executed agreement. But, that evidence did not persuade the Court that the Transfer or other actions taken as part of the Balcomb Plan were motivated by the Debtor's intent to hinder, delay, or defraud the Plaintiff or any other creditor.

consideration for the Transfer was adequate.[10]

### b) Additional Factors Rebut the Presumption of Fraudulent Intent

Furthermore, the Court finds that the other circumstances surrounding the Transfer are persuasive that the Transfer had a non-fraudulent purpose despite any presumption of fraud that may exist. Specifically, the Balcomb Plan resulted in the loss of a large part, if not all, of the equity Mrs. Arbaney enjoyed in the Real Estate prior to July of 2004; and all funds raised by means of the Balcomb Plan were used to make payments to creditors.

The Easement Appraisal calculated the decrease in value of the Real Estate following the conveyance of a conservation easement on one half of the property to be $210,500.00. Therefore, the value of the Real Estate declined by that amount after conveyance of the first conservation easement. If $875,000.00 is an accurate reflection of the value of the Real Estate prior to that conveyance, then after deducting the resulting $210,500.00 reduction in value, the remaining value of the Real Estate would only be $664,500.00. It is encumbered by mortgages that total at least $466,000.00. Based on the Easement Appraisal introduced into evidence by the Plaintiff, her current equity in the Real Estate is no more than $198,500.00. Thus, by operation of the Balcomb Plan, Ms. Arbaney has experienced a loss of equity. She has gained nothing as a result of the Transfer.[11]

Neither the Debtor nor Mrs. Arbaney received money generated by way of the Balcomb Plan. The plan was structured such that proceeds of the 2004 Alpine Loan were paid directly to creditors and payments made for the transfer of tax credits went directly to Alpine Bank to pay off that loan. Those trade creditors who received payments were the ones willing to compromise their claims. The fact that Scott Balcomb, on the Debtor's behalf, sought to compromise claims is not indicative of fraud. It is certainly common to seek those types of negotiated settlements where resources available are short of what is necessary to satisfy debts in full.

The totality of the evidence and the circumstances in this case persuade the

---

**10.** The fact that the Court's focus with respect to consideration has been on the question of whether or not the creditor body was harmed or the Debtor's estate was depleted by the Transfer does not mean that the question of whether or not Mrs. Arbaney gave consideration for the Transfer is irrelevant. She did give consideration. At the beginning of the process, she had equity in the Real Estate of at least $204,500.00 and the Real Estate was encumbered by two mortgages totaling $466,000.00. In the end, the Real Estate is still burdened by the mortgages and it is now encumbered by conservation easements covering the entirety of the Real Estate. After the Transfer, and as a consequence of the conveyance of the first conservation easement, her equity in the Real Estate is now less than the value of her half of the equity beforehand. The Court recognizes that Mrs. Arbaney did receive a benefit through the payoff of the four preexisting Alpine Bank notes. At the same time, that benefit, in all likelihood has been more than offset by the further reduction in the value of the Real Estate that resulted from the conveyance of the second conservation easement on the remaining half of the Real Estate.

**11.** This calculation does not take into account the reduction of the Real Estate's value that resulted from the conveyance of the second conservation easement in January of 2005 because the record before the Court lacks evidence of the value of that second conservation easement conveyance. As it is, Mrs. Arbaney experienced at least a modest reduction in her equity as a consequence of the Balcomb Plan. Once the value reduction that resulted from conveyance of that second conservation easement is taken into account, Mrs. Arbaney's equity may well have been eliminated entirely.

Court that the Transfer was made as part of an overall plan that represents a good faith, non-fraudulent, effort to pay business debts generated by the failure of Main Mechanical. The Plaintiff demonstrated sufficient indicia of fraud to raise a presumption of fraudulent intent and cause the Court to look to the Debtor for a good faith explanation of his activities. The Debtor carried that burden. He was able to pay a greater amount out to creditors than the equity that he had in the Real Estate. When the Court considers the effects of trying to sell the Real Estate under the circumstances as they existed at the time, and factors in the transactional costs of such a sale, it is likely the creditors received more under the Balcomb Plan than they would have received through a sale of the Real Estate. The same is true with respect to receiving payment as a result of a chapter 7 trustee selling the Real Estate in the Debtor's bankruptcy case. Again, it is clear that the creditors fared better. The fact that all of the funds raised by means of the Balcomb Plan were paid out to creditors simply bolsters the Court's conclusion that, despite the appearance of fraudulent behavior, the Transfer was made as part of a good faith effort to raise money for the sole purpose of satisfying creditor claims. The circumstances attending the Transfer are not characteristic of a scheme motivated by an intent to hinder, delay or defraud creditors. Accordingly, the Court will deny the Plaintiff's objection to Debtor's discharge under § 727(a)(2)(A).

### C. 11 U.S.C. § 727(a)(4)(A)

The Supreme Court has described the principle of "affording relief only to an 'honest but unfortunate debtor'" as "a basic policy animating the [Bankruptcy] Code." *Cohen v. de la Cruz*, 523 U.S. 213, 217, 118 S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998) (quoting *Grogan v. Garner*, 498 U.S.

279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991)). That policy is reflected in § 727(a)(4)(A) which denies the privilege of a bankruptcy discharge to a debtor who commits fraud with respect to the information provided to the court, creditors and trustee on the debtor's bankruptcy schedules or through other documents or testimony provided by the debtor in a bankruptcy case. That section provides that

> The court shall grant the debtor a discharge, unless ... the debtor knowingly and fraudulently, in or in connection with the case ... made a false oath or account.

11 U.S.C. § 727(a)(4)(A) (2004).

At the same time, Congress set the bar for denial of discharge under this section relatively high by specifying that the debtor must have made a false oath or account "knowingly and fraudulently." It is not enough for Plaintiff to point to inaccuracies and inconsistencies in the Debtor's schedules, as troubling as those might be. To deny the Debtor a discharge under § 727(a)(4)(A), the Court must be able to find that the Debtor intended to defraud and mislead the other parties in the case.

### 1) Burden of Proof

The burden of proof in a case seeking denial of discharge is always upon the party objecting to the debtor's discharge. FED. R. BANKR. P. 4005. Once the plaintiff has met its burden of presenting prima facie evidence going to each of the elements of its case, thereby raising a reasonable inference of the debtor's intentional fraud, the burden shifts to the debtor to provide a cogent explanation for the omissions or misstatements. *American Nat. Bank of Denver v. Rainguet*, 323 F.2d 881, 882 (10th Cir.1963); *Johnson v. Bockman*, 282 F.2d 544, 545 (10th Cir.1960); *Jones v. Gertz*, 121 F.2d 782, 783 (10th

Cir.1941); *Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 614–15 (10th Cir. BAP 2001) (burden shift under § 727(a)(3)); *Crane v. Morris (In re Morris)*, 302 B.R. 728, 742 (Bankr.N.D.Okla. 2003).

*2) Omissions from Debtor's Schedules*

The evidence shows that Debtor's original schedules, filed on January 27, 2005, omitted the following items.

1. The debt still owed to Alpine Bank;
2. Debtor's liability on the Vectra Bank and Washington Mutual mortgage loans;
3. Receipt of rental income for the cabin located on the Real Estate;
4. The pre-petition payments to Main Mechanical creditors funded by the July, 2004, Alpine Bank loan;
5. The August, 2005, transfer of the conservation easement;
6. The December 2005 sale of the tax credit generated by the earlier conservation easement transfer;
7. The December 2005 payment of approximately half of the July, 2004, Alpine Bank loan;
8. The Debtor's stock ownership interest in Main Mechanical.

Fifteen days later, on February 11, 2005, prior to the scheduled § 341 meeting of creditors, the Debtor filed an amended Statement of Financial Affairs ["SOFA"] and Schedule B. The Debtor added to those schedules the following items:

1. On the Amended SOFA, the Debtor added a continuation sheet that showed the following additional transfers:
   a. Payment of the four prior Alpine Bank notes;
   b. Assumption of Vectra and Washington Mutual debt in the amount of $233,000.00. Presumably this entry refers to Mrs. Arbaney's agreement to pay those debts, but the Debtor was never released from those debts by those creditors.
   c. Numerous pre-petition settlement payments to Main Mechanical's creditors.
2. On the Debtor's Amended Schedule B, he adds his stock ownership of Main Mechanical and shows that ownership as having $0.00 value.

On June 29, 2005, long after the March § 341 meeting of creditors and after three adversary complaints had been filed against him, the Debtor again amended his Schedule B. That amendment added two items;

1. Main Mechanical accounts receivable in the amount of $66,058.00;
2. Main Mechanical "bone pile" of spare parts and materials with $0.00 value.

As noted above, some of the omissions from the original schedules were corrected just fifteen days later of the Debtor's own volition. After those corrections were filed, the following matters remained uncorrected:

1. The debt still owed to Alpine Bank;
2. Debtor's liability on the Vectra Bank and Washington Mutual mortgage loans;
3. Receipt of rental income for the cabin located on the Real Estate;
4. The August, 2005, transfer of the conservation easement;
5. The December 2005 sale of the tax credit generated by the earlier conservation easement transfer;
6. The December 2005 payment of approximately half of the July, 2004, Alpine Bank loan.

*3) Elements of § 727(a)(4)(A)*

It is well-established that to prove an objection to discharge under § 727(a)(4)(A), the creditor must prove the following by a preponderance of the evidence: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.

*Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 228 (E.D.N.Y.2000); *see, also, Sholdra v. Chilmark Financial, LLP, (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir.2001); *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir.2000); *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir.1987); *Clean Cut Tree Service, Inc. v. Costello (In re Costello)*, 299 B.R. 882, 899 (Bankr.N.D.Ill. 2003); *Woolman v. Wallace (In re Wallace)*, 289 B.R. 428, 433 (Bankr.N.D.Okla. 2003); *Overly v. Guthrie (In re Guthrie)*, 265 B.R. 253, 262 (Bankr.M.D.Ala.2001); *Neugebauer v. Senese (in re Senese)*, 245 B.R. 565, 574 (Bankr.N.D.Ill.2000).

Plaintiff alleges that Debtor's false oath pertains to omissions from the Debtor's schedules. The Court finds that the Debtor's schedules were signed under oath. The Court finds that statements made in Debtor's schedules were false because items were omitted from his schedules. The Court further finds that Debtor had knowledge that his statements were false, at least in the sense that he did have knowledge of the items that were omitted from the schedules. At issue here is whether the Debtor omitted those items from his schedules through fraudulent intent and whether the omissions were material.

■ For the purposes of § 727(a)(4)(A), "[t]he subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir.1984); *see, also, Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir.1992); *Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir.1990). All of the matters omitted from the Debtor's schedules are material. Certainly all of them relate to the Debtor's financial dealings and assets.

■ In the vast majority of cases, fraudulent intent must be inferred from the facts and circumstances of the case. *Calder*, 907 F.2d at 955–56; *Farmers Co-op. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982). Under some circumstances, a reckless indifference to the truth, may lead to an inference of fraud for purposes of § 727(a)(4)(A). *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir.1987); *Diorio v. Kreisler–Borg Const. Co.*, 407 F.2d 1330, 1331 (2nd Cir. 1969); *Cadle Co. v. King (In re King)*, 272 B.R. 281, 302 (Bankr.N.D.Okla.2002); *Camacho v. Martin (In re Martin)*, 88 B.R. 319, 324 (D.Colo.1988).

■ The Court cannot find that the omissions from the Debtor's schedules were done with an intent to defraud. When the Court views the Debtor's schedules as a whole, it does not find a pattern of withholding or mischaracterizing information.

Even though the Court was not impressed with the Debtor's candor on the witness stand, it has no trouble finding that he lacks financial and legal sophistication. None of the matters identified above pertain to valuable assets that indicate an intent to withhold information or hide an asset from the trustee or the

Court. The omission of a creditor from the Debtor's schedules typically only involves consequences to the Debtor himself as it calls into question the effectiveness of the discharge as to those omitted creditors. The issue that a trustee would certainly want to investigate, the Transfer of the Real Estate interest to Mrs. Arbaney, was fully disclosed in the original schedules. While the Court and any attorney would certainly appreciate that the transfer of the conservation easement and subsequent transfer of the resulting tax credit were transfers of the Debtor's property interests, it is far less clear that an individual lacking in financial and legal sophistication would recognize them as such. Each of the items listed above should have appeared on the Debtor's schedules. However, it does not appear to the Court that the knowledge of those items would provide a trustee with any more assets to administer than he has with respect to the information that appears on the original schedules.

■ Nor can the Court find fraud in the fact that the assets of the Debtor's solely owned corporation do not appear in the more timely filed versions of Debtor's schedules and were not scheduled until the June 29, 2005, amendment. That amendment does not add property that is property of the Debtor personally. It is property of Main Mechanical. Main Mechanical was listed on the original SOFA. Just 15 days later, the Debtor's stock ownership of Main Mechanical was listed on the Debtor's amended property schedule. The Court believes that it is good practice for the assets of a debtor's solely owned corporation, (clearly identified as corporate assets) to appear on that debtor's individual bankruptcy schedules. But where the existence of the corporation itself is clearly disclosed on the schedules, the Court cannot find fraud in the omission of individual assets belonging, not to the Debtor, but to the Debtor's corporation.

The Court will deny the Plaintiff's objection to Debtor's discharge under § 727(a)(4)(A).

In accordance with the above discussion, it is

**ORDERED** that the Plaintiff's *Complaint Objecting to Discharge of Debtor* is hereby DENIED.